403 So.2d 35 (1981)
In re J. A. "Bob" WILKES, Justice of the Peace.
No. 81-0-0851.
Supreme Court of Louisiana.
June 22, 1981.
Rehearing Denied September 4, 1981.
*37 William R. Alford, Jr., Eugene J. Murret, New Orleans, for plaintiff-applicant.
George C. Stringer, Jr., Harahan, for defendant-appellee.

Disciplinary Proceeding
BLANCHE, Justice.
This is a disciplinary proceeding against a justice of the peace. La.Const. Art. V, § 25(C); Supreme Court Rules, Rule 23. The Louisiana Judiciary Commission conducted an evidentiary hearing, made findings of fact and law, and recommended that Justice of the Peace Wilkes be suspended from his office for a period of ninety days. The Commission then filed its recommendation with this Court for review.
The Judiciary Commission grouped its allegations of misconduct into two general charges. Charge I alleges that Judge Wilkes, in his official capacity, collected and attempted to collect illegal fees from people or businesses in whose behalf he had collected amounts due on open accounts and "N.S. F." checks. It is alleged that these actions amounted to willful misconduct and conduct prejudicial to the administration of justice, proscribed by La.Const. Art. V, § 25(C), violations of Canons 1, 2 and 5(C)(1) of the Code of Judicial Conduct, and violations of R.S. 13:2586.1, proscribing the collection of fees in criminal matters. Charge II alleges that Judge Wilkes, in his official capacity, threatened to arrest individuals for failure to satisfy purely civil obligations. It is alleged that these actions also amounted to willful misconduct and conduct prejudicial to the administration of justice, proscribed by La.Const. Art. V, § 25(C), and violations of Canons 1 and 2 of the Code of Judicial Conduct. The Commission found Judge Wilkes guilty of all violations alleged.
FACTS RELEVANT TO CHARGE I
Eight witnesses testified before the Commission concerning Charge I. Mr. Sal Mortillaro testified that sometime in 1978 he attempted to collect on an N.S.F. check. The Jefferson Parish Sheriff's Office referred him to Judge Wilkes' office. Mr. Mortillaro left the check with one of Judge Wilkes' employees. The debtor on the check then contacted Mr. Mortillaro to inform him that the check amount had been paid to Judge Wilkes. When Mr. Mortillaro went to pick up the money, an employee gave Mr. Mortillaro a portion of the check amount, but informed him that the remaining percentage was being withheld as a collection fee. Mr. Mortillaro contacted his brother Steve, an attorney and twice-unsuccessful political opponent of Judge Wilkes, about collecting the remainder from Judge Wilkes. Then Judge Wilkes personally went over to Sal Mortillaro's office and brought the remainder of the money. Judge Wilkes was said to have told Sal Mortillaro that there was a mistake, since he did not charge friends.
Steve Mortillaro testified that he sent two demand letters to Judge Wilkes requesting the return of an alleged twenty-five (25%) percent fee. When this testimony is coupled with the testimony of Sal Mortillaro, the implication is that except for Steve Mortillaro's actions, Judge Wilkes would never have been prompted to return the money which represented the fee.
Ms. Shirley Taylor, a manager of the Taylor Furniture Company, testified that sometime in 1979, the Jefferson Parish District Attorney's Office referred her to Judge Wilkes after she had trouble collecting amounts due on two N.S.F. checks. Ms. Taylor brought the two checks to Judge Wilkes' office. After Judge Wilkes presumably took some action, the debtor on one of the checks personally tendered payment to Ms. Taylor. Ms. Taylor then contacted Judge Wilkes' office and she testified that the secretary in the office informed her that she must pay a fee of twenty-five (25%) percent. However, Ms. Taylor never did pay the fee. After this *38 turn of events, Ms. Taylor never heard anything further from Judge Wilkes concerning collection of the other check.
Mr. Michael J. Marino is the owner of International Bicycle Shop, Inc. He testified that he contacted Judge Wilkes in 1974, after an individual with Mississippi identification stopped payment on a check issued one day earlier for the purchase of a bicycle. The Jefferson Parish Sheriff's Office suggested that Mr. Marino contact Judge Wilkes concerning the swearing of a criminal affidavit. Marino testified that when he went to Judge Wilkes' office, the judge informed Marino that he would call the debtor and scare him, but that there would be a forty (40%) percent fee. Judge Wilkes told Marino that he couldn't help Marino collect the debt if Marino did not want to agree to those terms.
Eventually, Marino "made enough noise" that Wilkes issued a warrant for the arrest of the debtor. Marino mailed a copy of the warrant to the debtor and the debtor promptly paid Marino. Marino paid no fee to Judge Wilkes.
Three employees of the Gaylord's Department Store chain also testified as to the systematic deduction of a twenty-five (25%) percent collection fee on N.S.F. check collections. William Hornberger, Jr., regional security supervisor with Gaylord's National Corporation, testified that in approximately 1978, when he personally asked Judge Wilkes to let him examine opened files and queried Wilkes regarding the twenty-five (25%) percent collection fee, "he (Wilkes) got made as heck and threw me out of his office." Mr. Hornberger also testified that although Judge Wilkes claimed to have made the fee arrangement with one of the corporation people in New York, he had contacted people in the company and could discover no formal arrangement of any kind.
Janet Pilgrim and Diane Christian, local employees of two Gaylord's stores, testified that they each brought several bad checks each month to Judge Wilkes. The cumulative time period of these activities ran from some time in 1979 until August of 1980.
They also testified that Judge Wilkes' office always deducted a twenty-five (25%) percent collection fee on all checks collected. Ms. Pilgrim added that in July of 1980, Judge Wilkes queried her as to whether she felt that Gaylord's was forced to pay the fee and whether she could get a letter from Gaylord's that they voluntarily gave him the fee. She further stated that at that time, Judge Wilkes informed her that until allegations of misconduct had been cleared, he would no longer make collections for Gaylord's.
Ms. Margarite Smitherman, an employee of Judge Wilkes from October 1978 until March 1980, testified concerning the collection procedure. When a person brought in a bad check, a letter would be sent to the debtor and a copy of the check would be stapled to a carbon copy of the demand letter and retained in a file. When a debtor came in and paid an N.S.F. check, the check would be returned to the debtor. The payment would be turned over to the Judge or placed in petty cash. When the creditor came into the office, he would be paid the amount of the debt less a twenty-five (25%) percent deduction labelled a collection fee.
FACTS RELEVANT TO CHARGE II
Mr. Don Johnson, a publisher, testified that about two years ago, a dispute arose between himself and another company which claimed that Johnson owed it $1600 on an open account. Although Johnson had retained counsel to represent him in the dispute, he testified that he received a letter from Judge Wilkes threatening to send him to jail if the debt was not satisfied. Johnson then called Judge Wilkes, and testified that Judge Wilkes told him that "people who don't pay bills in my District go to the penitentiary."
Mr. Harold Quinlivan, a tax accountant and contractor, testified that he received a letter dated December 2, 1977 to the effect that if he did not pay a particular bill for $11.50, "... a warrant for [his] arrest [would] be issued." Mr. Quinlivan further testified that he does one million dollars' worth of purchasing each year for his business, and often has disputes on bills. Enraged *39 by the letter, Quinlivan called Judge Wilkes. Judge Wilkes told Mr. Quinlivan to "just forget about" the entire incident.
A photostatic copy of the letter to Mr. Quinlivan was filed in the record. In addition, two other letters addressed to individuals in behalf of Gaylord's were filed in the record. All of the letters are form letters bearing the name and seal of the Parish of Jefferson, as well as Judge Wilkes' name, title and address. The form content is as follows:
"This Court is holding a check dated ____ in the amount of $____ given by you to ______. This check has been returned by your bank as being
________.
Restitution is now being demanded. If this Court does not hear from you immediately, a warrant for your arrest will be issued."
The form letter also bears Judge Wilkes' signature. In Mr. Quinlivan's case, the form was altered to state that Judge Wilkes was holding a bill given to Mr. Quinlivan by Phil's Window Repair. The second sentence of paragraph one was deleted by typewriter through the generous use of the letter "X" over each space in the sentence.
JUDGE WILKES' TESTIMONY
Judge Wilkes testified in his own behalf. He presented an affidavit from a former manager of one Gaylord's branch store in which the manager claims to have had an "arrangement" with Wilkes from 1965 to 1972, whereby Wilkes was allowed to keep ten (10%) percent of all amounts collected on bad checks in order to offset office expenses, which amount generally totalled $100 per year. He also admitted that on some occasions, he did collect a percentage on check collections to help defray office expenses.
Concerning the particular factual allegations contained in the charges, Judge Wilkes denied making any statements to the Mortillaro brothers regarding a collection fee or favored treatment for friends. However, concerning the other factual allegations, Wilkes stated that he could not recollect specific statements or arrangements with the other witnesses concerning collection fees, nor could he remember threatening anyone with incarceration for failure to pay civil obligations and, therefore, could not deny these charges. With regard to imprisonment threats against Mr. Quinlivan, he denied knowledge of the letter sent to him, since Wilkes claims to have known that he could not put people in jail for failing to pay debts.
The remainder of Judge Wilkes' defense was an attempt to discredit the witnesses against him. He characterized the Mortillaros' testimony as an attempt to discredit him after he defeated Steve Mortillaro twice at the polls. Through cross-examination, counsel for Judge Wilkes elicited testimony from Mr. Marino that Mr. Mortillaro once bought a bicycle from him. Counsel also elicited testimony from Mr. Johnson that he met Mr. Mortillaro after the occurrence of the events which he related at the hearing. And finally, Mr. Quinlivan testified that he was a client of Steve Mortillaro's law associate and allowed Mr. Mortillaro to utilize the letter forming a basis of Charge II during one of Mortillaro's unsuccessful bids for Judge Wilkes' office.
FINDINGS OF THE COMMISSION
The findings of fact with regard to Charge I can be summarized as follows:
(1) Judge Wilkes attempted to collect a twenty-five (25%) percent fee from Mr. Sal Mortillaro.
(2) Judge Wilkes informed Michael Marino, Jr., that a forty (40%) percent collection fee would be charged if Mr. Marino wished the Justice of the Peace to aid him in collecting checks.
(3) Judge Wilkes' office attempted to collect a twenty-five (25%) percent collection fee from Ms. Shirley Taylor on an N.S.F. check which she presented to the office of the Justice of the Peace.
(4) Between 1974 and August 1980, Judge Wilkes systematically used his office as a collection agency for Gaylord's National, Inc. The fee was twenty-five (25%) percent of the amount collected.
*40 (5) Judge Wilkes charged Dr. Dan Frisard $5.00 for collecting $27.50 due on an N.S.F. check.
With regard to Charge II, the Commission found that Judge Wilkes did cause to be sent to Mr. Quinlivan a letter threatening him with arrest for failure to pay an amount due on an "open account". It also found that Judge Wilkes caused a letter to be sent to Don Johnson threatening him with arrest for his failure to pay a totally "civil" obligation.
The Commission found as a matter of law that the foregoing actions constituted willful misconduct relating to Judge Wilkes' official duty and persistent public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, and also constituted violations of Canons 1 and 2 of the Code of Judicial Conduct. With regard to the findings forming the basis of Count I, the Commission also concluded that Judge Wilkes violated Canon 5(C) of the Code of Judicial Conduct and R.S. 13:2586.1.
REVIEW BY THIS COURT
At the outset, this Court finds manifest error in the factual finding concerning Dr. Dan Frisard. The only substantial mention of Dr. Frisard was during the examination of Judge Wilkes. Judge Wilkes could not recall imposing a collection fee upon Dr. Frisard, but added, "... if that's what he says, that would also be correct." However, Dr. Frisard did not testify at the hearing and there is no evidence that Frisard would clearly and convincingly substantiate the charges other than an orally offered stipulation, assented to by counsel for Judge Wilkes, that "if these witnesses were called, they would testify to these charges."
With regard to the factual findings based upon testimony of the other witnesses, our review of the record indicates that the factual findings substantially comport with the testimony and there is no evidence in the record which could lead this Court to dispute the implied credibility determinations of the Commission. Thus, this Court treats these findings of the Commission as its own.
With the exception of the events related by Mr. Marino and some of the events pertaining to the Gaylord's "account", all of the facts found by the Commission occurred after the effective dates of the most recent Constitution and Code of Judicial Conduct.
Louisiana Constitution, Art. V, § 25(C), (1974) provides in pertinent part:
"On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony."
In addition to these substantive grounds for disciplinary action against a judge, this Court, in accordance with its constitutional power of supervision over all lower courts, adopted the Code of Judicial Conduct, effective January 1, 1976. See La.Const. Art. V, § 5(A) (1974); In re Babineaux, 346 So.2d 676 (La.1977), U.S. cert. den., Berry v. Judiciary Commission of La., 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 299 (1977). The Code is binding on all judges, and violations of the Canons provided by this Code can serve as a basis for the disciplinary action provided for by Article V, § 25(C) of the Constitution. See In re Babineaux, supra.
CHARGE I
The collection of a contingency fee by a justice of the peace for services performed in the line of duty is not permitted by law. R.S. 13:2586[1] prohibits justices of *41 the peace from demanding any fees in civil matters other than those scheduled in the statute. Nowhere in the statute is a contingency fee allowed. With regard to criminal matters, R.S. 13:2586.1[2] and its predecessors' provisions[3] clearly prohibit justices of the peace from receiving any fees in criminal and peace bond matters other than salaries fixed by governing authorities. Since fee arrangements of the type employed by Judge Wilkes were unlawful regardless of whether the complaints of the witnesses were civil or criminal in nature, this Court need not determine, as the Commission did,[4] that the arrangements were violations of R.S. 13:2586.1.
Not only did the imposed and attempted fee arrangements violate the express provisions of statutory law, they also violated Canons 1, 2 and 5(C)(1) of the Code of Judicial Conduct.[5] The basic theme running *42 throughout these articles is that a judge must at all times preserve the integrity, independence and impartiality of his own office and the judiciary. Canons 1 and 2 state this in a general manner while Canon 5 deals specifically with financial activities.
The Canon most closely related to the findings of fact is Canon 5. The standard fee arrangements which Judge Wilkes employed and attempted to employ in the conducting of his official duties gave and would give him a financial interest in the outcome of disputes before his court both in terms of the initial liability of an alleged debtor and the amount due. In order to receive a fee, Judge Wilkes would have to decide that the alleged creditor in the collection matter was entitled to recovery. After that, the dollar amount of his fee would depend upon the amount he would find due under the obligation.
While there is no testimony which indicates that Judge Wilkes acted partially because of the arrangements, Canon 5 proscribes financial and business dealings that "tend to reflect adversely on his impartiality". There can be little doubt that a fee arrangement of the type utilized by Judge Wilkes tended to reflect adversely on his impartiality since his entitlement to a fee in collection cases depended on judgment in favor of a particular class of persons.
Similarly, it must be said that Judge Wilkes violated the provisions of Canon 1, which requires a judge to observe and maintain a high standard of conduct so that the integrity and independence of the judiciary may be preserved. By doing acts which tended to reflect adversely on his own impartiality with regard to his judicial tribunal, his conduct could only serve as a partial undermining of the soundness of the entire judiciary.
Canon 2 seeks to avoid the appearance of impropriety on the part of judges by requiring a judge to respect and comply with law as well as conduct himself in a manner that promotes public confidence in the integrity and impartiality of the judiciary. In addition, a judge must not allow personal and business relationships to interfere with his impartiality. It is quite clear that Judge Wilkes' fee arrangements were not sanctioned by law. See discussion, supra. Thus, he failed to comply with the requirements of this Canon.
In defense, Judge Wilkes claims that he had not even heard of the Code of Judicial Conduct (and presumably the Constitutional proscriptions) prior to the institution of the instant proceedings. However, ignorance of these provisions of the Code (and Constitution) is no defense so long as Judge Wilkes intentionally or consciously committed acts for which Art. V, § 25(C) of the Constitution recognizes a disciplinary action. See In re Dupont, 322 So.2d 180, 184 (La.1975); In re Haggerty, 241 So.2d 469, 478; State v. O'Hara, 252 La. 540, 211 So.2d 641, 648 (La.1968); see also C.C. art. 7; R.S. 14:10, 11, 17.
Considering the facts in support of the statutory and Code of Judicial Conduct violations, this Court concurs in the findings of the Judiciary Commission that Judge Wilkes is guilty of willful misconduct relating to his official duty and persistent and *43 public conduct prejudicial to the administration of justice that brings the judicial office into disrepute. La.Const. Art. V, § 25(C). While acting in his official capacity, he intentionally, over a course of years, entered and attempted to enter unlawful fee arrangements giving himself a stake in the particular outcome of disputes before his tribunal.
Judge Wilkes' actions with respect to Mr. Marino in 1974 and the Gaylord's account from 1974 through 1975 occurred prior to the effective date of the Code of Judicial Conduct, January 1, 1976. In addition, some of these same actions occurred prior to the effective date of the most recent Louisiana Constitution, midnight, December 31, 1974. However, the violations taken as a whole are so obviously improper that they are sufficient, standing alone, to constitute violations of the substantive provisions of Art. V, § 25(C) of the Constitution of 1974, as well as an almost identical provision of Art. IX, § 4(B) of the Constitution of 1921, as each applies to the facts at issue.[6]
CHARGE II
The failure of a person to make payments on an open account is not, of itself, a crime in Louisiana. It is, therefore, highly improper for a judge to threaten to imprison someone merely because he receives word that an account has not been paid. The proper remedy in such a situation is for a complainant to institute civil proceedings for recovery of the amount allegedly due.
The evidence clearly establishes that on at least two occasions, Judge Wilkes used his office to threaten individuals with arrest and incarceration for mere failure to make payments on open accounts. And since Judge Wilkes testified that he knew that the law did not allow incarceration for failure to pay one's bills, he cannot claim that his conduct was excusable due to ignorance of the Constitution and Code of Judicial Conduct. Thus, his actions clearly constituted a low standard of conduct and clearly created an appearance of impropriety. Code of Judicial Ethics, Canons 1, 2. They also constituted willful misconduct related to his official duty and at least when combined with the long line of actions enumerated in Charge I, persistent and public conduct prejudicial to the administration of justice. La.Const. Art. V, § 25(C).
SANCTIONS
After considering the testimony, the Judiciary Commission recommended that Judge Wilkes be suspended without pay from the performance of any functions associated with his office for a period of ninety days.
In mitigation, Judge Wilkes argues that his primary concern during his tenure as Justice of the Peace has been the expeditious and fair resolution of disputes with minimum expense to the parties. He claims that if during his tenure any misconduct did occur, it was merely the result of bad judgment by one untrained in law and unaware that the Code of Judicial Conduct applied to him. In support of his claim of fairness, Judge Wilkes filed with this Court several letters from various individuals, businesses and civic organizations attesting to his impartiality and high integrity.
Judge Wilkes did testify that he voluntarily stopped all practices alleged in the charges as improper prior to the hearing date, and he assured the Commission at the hearing that he would refrain from engaging in those practices in the future. He also informed the Commission that he would inform other Justices of the Peace of the applicability of the Code of Judicial Conduct to them, and explain his situation to them in order that they might avoid similar improprieties.
*44 While this Court does not question Judge Wilkes' sincerity, it cannot condone his actions. Judge Wilkes, as Justice of the Peace, is governed by the same constitutions and laws which govern all courts and judges of this state. He is bound to apply the law as written by the legislature and construed by the various courts. That he is a layman untrained in law does not relieve him of his responsibility to follow the rule of law, nor does it empower him to unilaterally supersede substantive law and procedure, especially where, as here, there is not one scintilla of evidence indicative of a good faith attempt at compliance with law.
Judge Wilkes' blanket disregard for the law seriously undermines the integrity of the entire judicial process. The testimony of all the witnesses indicates their impression that Judge Wilkes was using his official governmental position to act as a collection agency for private parties. When citizens in contact with any court get the impression that courts serve only the interests of a few, the legitimacy of the entire court system is seriously undermined. Mere censure for conduct so serious can only heighten the disdain.
In light of the seriousness of the offenses proven in relation to the particular office, it is ordered that Justice of the Peace J. A. "Bob" Wilkes, is hereby suspended from all rights and duties connected with his position, without any compensation, for a period of ninety days from finality of this judgment.
LEMMON, J., dissents and assigns reasons.
MARCUS, J., dissents for reasons assigned by LEMMON, J.
CALOGERO, J., dissents only from the extent of disciplinary action imposed and joins in the reasons assigned by LEMMON, J.
LEMMON, Justice, dissenting.
Arguably Judge Wilkes, motivated by good intentions, attempted to collect on debts or bad checks by personal efforts and then illegally charged fees on successful collections to defray office expenses, when he could have accepted suits on the small claims and legally demanded and received fees under R.S. 13:2586. But even if proper motivation is assumed, the practice was wrong and must be condemned.
The difficult question is the appropriate penalty. This record contains almost 200 letters from businessmen and civic leaders who praise Judge Wilkes' efforts, accomplishments and willingness to serve the public. It is also asserted that these same practices are widespread among justices of the peace, who may not know of the prohibitory laws. There are undertones in this case of political motivation in some of the charges against Judge Wilkes. Finally, and significantly, Judge Wilkes immediately discontinued all objectionable practices when notified by the Commission.
When all circumstances are considered, I believe that censure is sufficient disciplinary action to punish any misconduct by Judge Wilkes and to warn any other justices of the peace that such practices are wrong and will be dealt with more severely in the future.
NOTES
[1] The findings of fact all deal with a period of time prior to the adoption of a 1980 amendment to this statute which changed the amounts of most of the fees and deleted the word "and" at the end of paragraph (25).

R.S. 13:2586 prior to this amendment provided as follows:
"A justice of the peace may demand and receive the following fees and no others in civil matters: (1) Filing and docketing each suit, twenty-five cents; (2) Writing, taking, and signing affidavits, twenty-five cents; (3) Copy of any document, or making transcript of appeal when required, for each one hundred words, fifteen cents; (4) Issuing citations, fifty cents; (5) Issuing copy of citations, twenty-five cents; (6) Filing all documents, ten cents; (7) Rendering and entering any interlocutory judgment, twenty-five cents; (8) Rendering and entering a final judgment, fifty cents; (9) Issuing notice of judgment, fifty cents; (10) Issuing copy of notice of judgment, twenty-five cents; (11) Issuing order of appeal, fifty cents; (12) Issuing notice of appeal, fifty cents; (13) Issuing copy of notice of appeal, twenty-five cents; (14) Issuing writ of fieri facias, one dollar; (15) Filing return on writ on fieri facias, twenty-five cents; (16) Entering satisfaction of judgment, fifty cents; (17) Certified copy of judgment, fifty cents; (19) Issuing a subpoena for a witness, each, twenty-five cents; (19) Issuing a copy of a subpoena for a witness, each, twelve and a half cents; (20) Issuing an attachment for a witness, twenty-five cents; (21) Issuing order and writ of subpoena duces tecum, fifty cents; (22) Issuing order and writ of attachment, sequestration, or injunction, seventy-five cents; (23) Filing of any of above writs, twenty-five cents; (24) Filing and entering any return not provided for above, ten cents; (25) Writing, taking, and approving bond when required, one dollar; and (26) Executing a commission to take testimony, one dollar." Added Acts 1960, No. 32, § 4.
[2] R.S. 13:2586.1, added by Acts 1975, No. 87, § 1, provides:

"Justices of the peace and constables shall receive no fees in criminal matters or in peace bond cases, but in lieu thereof they shall receive such salaries as are fixed by the parish governing authority and paid by the parish, which salaries shall be graded."
[3] Some of the factual findings deal with a period of time prior to the adoption of R.S. 13:2586.1. Prior to the adoption of this statute, fees of justices of the peace were controlled by Art. VII, § 50 of the Constitution of 1921. When the Constitution of 1974 was adopted prior to the enactment of this statute, the provisions of Art. VII, § 50 were deemed statutory by the 1974 Constitution until arranged in proper statutory form or modified. La.Const. Art. XIV, §§ 16(A)(5), 16(B) (1974). Thus, the predecessor of R.S. 13:2586.1, as stated in the 1921 Constitution and retained by the 1974 Constitution until the adoption of Act No. 87 of 1975, provided in part:

"... They [Justices of the Peace] shall receive no fees in criminal matters, nor in peace bond cases, but in lieu thereof such salaries as may be fixed by the police jury, and paid by the parish, which salaries shall be graded."
[4] The Commission incorrectly assumed that since issuing worthless checks with fraudulent intent is a crime, R.S. 14:71, any fee received for collecting amounts due on an N.S.F. check was necessarily a fee received in connection with a criminal matter. However, there is no indication in the record that criminal charges were pending on any of the collections involved in the charges, or that the actions taken by Judge Wilkes amounted to anything more than attempts to collect amounts due under civil obligations.
[5] "CANON I. A Judge Should Uphold the Integrity and Independence of the Judiciary. An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective. As a necessary corollary, the judge must be protected in the exercise of his judicial independence."

* * * * * *
"CANON 2. A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities. A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. B. A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interest of others; nor should he convey or permit others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness."
* * * * * *
"CANON 5. A Judge Should Regulate His Extra-Judicial Activities to Minimize the Risk of Conflict with His Judicial Duties. * * * C. Financial Activities. (1) A judge should refrain from financial and business dealings that tend to reflect adversely on his impartiality, interfere with the proper performance of his judicial duties, exploit his judicial position, or involve him in frequent transactions with lawyers or persons likely to come before the court on which he serves."
[6] La.Const. Art. IX, § 4(B) (1921) provides in part:

"B. Grounds for removal or involuntary retirement. A justice or judge may be removed from office or retired involuntarily for willful misconduct relating to his official duty or willful and persistent failure to perform his duty, or for habitual intemperance, or for conviction, while in office, of a felony." (emphasis added)