85 So.3d 5 (2012)
In re Justice of the Peace Herbert G. WILLIAMS, Jr., Parish of Plaquemines, Ward 2, State of Louisiana.
No. 2011-O-2243.
Supreme Court of Louisiana.
January 24, 2012.
*7 Office of Special Counsel, Henry Nathan Bellany, Special Counsel, Michael Bewers, Assistant Special Counsel, for applicant.
Scandurro & Layrisson, LLC, New Orleans, Stephen O'Brien Scandurro, Timothy David Scandurro, for respondent.

ON RECOMMENDATION FOR DISCIPLINE FROM THE JUDICIARY COMMISSION OF LOUISIANA
WEIMER, Justice.
This matter comes before the court on the recommendation of the Judiciary Commission of Louisiana (Commission), pursuant *8 to La. Const. art. V, § 25(C), that Herbert G. Williams, Jr., a Justice of the Peace for the Parish of Plaquemines, Ward 2, State of Louisiana (JP Williams), be publicly censured and ordered to reimburse the costs incurred in the Commission's investigation and prosecution of this case. Following an investigatory hearing, the Commission made findings of facts and conclusions of law and determined that JP Williams had violated Canons 1, 2(A), 2(B), 3(A)(1), and 3(B)(1) of the Code of Judicial Conduct. After a thorough review of the facts and law in this matter, we agree with that determination and accept the Commission's disciplinary recommendation.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY
In his capacity as an ex officio notary public by virtue of his position, JP Williams[1] notarized an act of donation on February 4, 2003, purporting to transfer ownership of immovable property located in Plaquemines Parish from the "Family of JOSEPH W. LARCHE" (Donor) to JP Williams' son and daughter-in-law, Herbert T. Williams and Constance S. Williams (Donees). The act of donation was not recorded in the conveyance records until May 15, 2007. Upon discovering the purported donation in 2009, the purported Donor filed a complaint with the Federal Bureau of Investigation (FBI) and a lawsuit in a Louisiana federal district court to clear the title to the property at issue.
In light of an article that appeared in the local newspaper concerning the complaint, the Commission opened a file in this matter.[2] JP Williams was notified that a file had been opened. After receiving JP Williams' response, the Commission filed a formal charge (No. 0303) against JP Williams on December 9, 2010, alleging that he engaged in judicial misconduct by notarizing an act of donation of land to his son and daughter-in-law, which transaction was beyond his limited ex officio notarial powers,[3] and without witnessing the Donor's signature in violation of Canons 1, 2(A), 2(B), 3(A)(1), and 3(B)(1) of the Code of Judicial Conduct.[4] The Commission *9 further alleged that JP Williams engaged in willful misconduct relating to his official duty and in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of La. Const. art. V, § 25(C).
Subsequently, a hearing officer was appointed to conduct proceedings pursuant to Supreme Court Rule XXIII, § 29. Following a hearing, the hearing officer filed a report with the Commission, containing proposed findings of fact and conclusions of law. JP Williams was then ordered to appear before the Commission to answer questions and to make any statement he desired regarding the formal charge and the hearing officer's findings and conclusions. Afterwards, the Commission issued a report with its findings of fact, conclusions of fact and law, and recommendation.
Adopting most of the hearing officer's findings of fact, the Commission initially found that it was unclear from the testimony at the hearing what training regarding his ex officio notarial functions JP Williams had received at the annual justice of the peace training sessions conducted by the Louisiana Attorney General's Office.[5] The Commission further found that on February 4, 2003, JP Williams notarized an act of donation by which the "Family of JOSEPH W. LARCHE" purported to donate certain immovable property in Plaquemines Parish, Louisiana, to JP Williams' son and daughter-in-law, "in consideration of the love and affection Donor has for the [Donees] and for the gratitude felt by Donor for the services and assistance rendered unto them [sic] by [Donees]." JP Williams notarized the act of donation even though he was not a commissioned notary public and the purported Donor of the property had not appeared before him to sign the act of donation.[6]
Following the filing of a malfeasance complaint with the FBI by Mr. Larche, these facts were made known to the public by The Times-Picayune in an article titled "Man complains to FBI about JP-Williams notarized fake transfer, he says."[7] The article reported that Mr. Larché alleged that JP Williams "abused his powers as an elected official to benefit relatives" by "notarizing a bogus real estate document purporting to donate two vacant lots the man owns to the justice's son."
At the time that JP Williams notarized the act of donation in favor of his son and daughter-in-law, JP Williams was not aware of the statutory limitations on the powers of a justice of the peace as an ex officio notary public.[8] Nonetheless, this was "the only [immovable] property document that [he had] ever notarized." Furthermore, although JP Williams knew that he should not notarize a person's signature unless the person placed his or her signature on a document in JP Williams' presence, he did so in this case because he trusted his son who told him that the Donor had signed the document. JP Williams has never notarized any other *10 document when the person signing the document was not present.
The Commission further found that the act of donation was fraudulent[9] and was not signed by or on behalf of Mr. Larché.[10] In hindsight, JP Williams acknowledged that because he was not sure about the "squiggly little sign" that purported to be the Donor's signature, he "should have followed [his] first mind" and "not have messed with that paper, period." JP Williams has learned his lesson and has promised never to engage in such conduct again. In closing the proceedings before the Commission, JP Williams stated:
[I]t wasn't that I was coaxed into this. It was just something that I thought I was doing right. I thought my son and daughter-in-law was legitimate and real about what they were doing.
. . . .
I wasn't trying to acquire or ... scrounge up no property or land or whatever for anybody because we [are] always doing something for the community.
. . . .
So it wasn't really [that] I was trying to acquire anything for my family or me personally. It was just something that happened.
When JP Williams and his son began receiving correspondence in connection with the lawsuit involving the act of donation, JP Williams questioned his son about the document. JP Williams' son said "as far as he was concerned this was donated to him by the Larche family." However, since JP Williams did not have the authority to notarize the act of donation, his son was "willing to consent and let Mr. Larche have his property back." Subsequently, Mr. Larche's suit against JP Williams, the Donees, and the Clerk of Court for Plaquemines Parish to clear title to the property was resolved by a consent judgment, which declared the act of donation to be a nullity and ordered that the act be stricken from the public records. Mr. Larché agreed to settle his monetary demands for the sum of $1,250, which JP Williams paid.
Based on the facts of this case, the Commission concluded that by notarizing the act of donation purporting to transfer immovable property to his son and daughter-in-law without witnessing the Donor execute the act of donation, JP Williams violated Canons 1, 2(A), 2(B), 3(A)(1), and 3(B)(1) of the Code of Judicial Conduct.[11] *11 JP Williams did not have legal authority to notarize the act of donation because he was not a commissioned notary and he was prohibited by law from using his ex officio notarial powers as a notary public to notarize any document affecting immovable property. See LSA-R.S. 13:2586.1(B)(1). The knowledgethat he should not notarized a document containing the signature of a party who did not sign in his presenceshould have been enough to prevent him from notarizing the signature of the Donor in the act of donation despite his lack of knowledge about the limitation of his notarial authority.
Although JP Williams may not have actually known that he was prohibited by law from notarizing documents affecting immovable property, he was nevertheless charged with the responsibility of knowing what the ex officio notarial duties of a justice of the peace are. See In re Wilkes, 403 So.2d 35, 44 (La.1981). By notarizing a document that he had no legal authority to notarize and by disregarding the law in doing so, JP Williams violated the Code of Judicial Conduct. JP Williams did not observe the high standards of conduct as required by Canon 1 and he did not comply with the law as required by Canon 2(A)(1) or maintain competence in the law as required by Canon 3(A)(1).
In the newspaper article in The Times-Picayune, JP Williams was portrayed in a very negative light giving rise to concerns among his constituents. Therefore, JP Williams failed to act in such a way that the integrity and independence of the judiciary would be preserved as required by Canon 1, and he failed to act in a manner that promoted public confidence in the integrity and impartiality of the judiciary as required by Canon 2(A). By acknowledging that he would have handled the matter differently had his son not been involved, JP Williams acknowledged that he allowed family relationships to influence both his judicial conduct and judgment in violation of Canon 2(B), and he showed bias in favor of his family members in violation of Canon 3(B)(1).
The Commission, however, observed that JP Williams realized the impropriety of his actions and that he cooperated in the resolution of the lawsuit brought by Mr. Larche to clear title to the property described in the act of donation.

DISCUSSION
Article V, § 25(C) of the Louisiana Constitution provides the substantive grounds for disciplinary action against a judge.[12] The Code of Judicial Conduct, *12 adopted by this court under its supervisory authority, supplements the constitution's substantive grounds for disciplinary action against a judge. The Code is binding on all judges, including justices of the peace.[13]In re Justice of the Peace Alfonso, 07-0120 (La.5/22/07), 957 So.2d 121, 125. Violations of the Canons contained in the Code can serve as a basis for the disciplinary action provided for by La. Const. art. V, § 25(C). Alfonso, 957 So.2d at 125. Furthermore, a justice of the peace is governed by the same constitutions and laws that govern all courts and judges of this state, and a justice of the peace is bound to apply the law as written by the legislature and construed by the various courts. Id. That a justice of the peace is untrained in the law does not relieve a justice of the peace of the responsibility to follow the rule of law. Id.; see In re Adams, 11-0121 (La.5/10/11), 63 So.3d 948, 954.
An act by a judge or justice of the peace need not be intentional to support judicial discipline. Alfonso, 957 So.2d at 125, citing In re Hunter, 02-1975 (La.8/19/02), 823 So.2d 325, 336.[14] A lack of conscious intent can still support the imposition of judicial discipline. See Alfonso, 957 So.2d at 126, citing In re Elloie, 05-1499 (La.1/19/06), 921 So.2d 882, 902.
Based on a thorough review of the record in this case, we agree with the Commission's factual findings and conclusions of fact and law. JP Williams unknowingly exceeded his authority as a justice of the peace by notarizing the act involving the transfer of an immovable in violation of La. R.S. 13:2586.1(B)(1). More disappointing is the fact that he allowed his family members to take advantage of his position by having him notarize a document without having all of the parties appear before him, which he knew was a violation of the law. See La. C.C. arts. 1833 and 1839.[15] Undoubtedly, his actions resulted in a violation of Canons 1, 2(A), 2(B), 3(A)(1), and 3(B)(1) of the Code of Judicial Conduct as found by the Commission. Thus, we must decide the appropriate discipline.
In recommending discipline, this court has set forth a non-exclusive list of factors to be considered in imposing discipline on a judge. See In re Chaisson, 549 So.2d 259 (La.1989).[16] Utilizing these *13 factors, the Commission concluded that this was an isolated instance of misconduct, which did not occur in court but did occur in connection with JP Williams' official duties. JP Williams acknowledged his wrongful acts and assured the Commission that they would not recur. The Commission considered his statements in this regard to be sincere in light of JP Williams' efforts in resolving his conflict with Mr. Larché, as well as his cooperation in the disciplinary proceedings. Despite the fact that he had been in office for five years, JP Williams was not aware at the time of his misconduct that he could not notarize documents involving immovable property. Nonetheless, JP Williams knew that he was not supposed to notarize a document that was not signed in his presence. He made a conscious decision to deviate from the latter rule in this instance in spite of having doubts about doing so.
JP Williams has no history of prior ethical misconduct. However, JP Williams' misconduct caused harm to Mr. Larché and to the public by placing a cloud on the title to the property that rendered it unmarketable until Mr. Larche's federal lawsuit was resolved. Furthermore, JP Williams' actions had a significant effect on the integrity of and respect for the judiciary, particularly in light of the negative publicity received in the news media. The fact that the transaction benefitted members of his family exacerbated the negative perception of the judiciary that was created when his actions were reported in the news media. However, there was no evidence that JP Williams exploited his judicial position for personal gain.
In determining an appropriate sanction, we are mindful that the primary purpose of the Code is the protection of the public rather than simply to discipline judges. In re Marullo, 96-2222 (La.4/8/97), 692 So.2d 1019, 1023. The discipline to be imposed depends on the facts of each case and the totality of the circumstances, and is guided by the factors identified in Chaisson. See Chaisson, 549 So.2d at 266.
Factors contributing to the seriousness of JP Williams' violation of the Code are that his misconduct occurred in the performance of his judicial duties; he was not new to his position as justice of the peace, having served one complete term prior to this violation; and his misconduct caused harm to Mr. Larche and negatively impacted the public's confidence in and respect for the judiciary.
Obviously, the hearing officer and Commission, who saw and heard JP Williams, believed that he did not act with fraudulent intent. If we thought that JP Williams had deliberately engaged in such action in bad faith, the disciplinary action of public censure as recommended by the Commission would be insufficient for the misconduct involved.[17] However, this was an isolated instance of misconduct by JP Williams for which he is remorseful. JP Williams had no prior complaints against him. Furthermore, upon receiving notice of his misconduct, JP Williams worked with Mr. Larche to remedy the situation and demonstrated cooperation with the Commission. Finally, his commitment to the Commission was that he would not *14 notarize any act without requiring the parties to appear and sign in his presence and would not notarize an act involving immovable property in the future. Apparently, the Commission was convinced he would not repeat the mistake made in this matter.
Under the circumstances of this case, we conclude that public censure would adequately serve the purpose of this disciplinary proceeding. Accordingly, we will accept the recommendation of the Commission and publicly censure JP Williams, as well as order him to pay the costs of these proceedings.

DECREE
For the reasons assigned, it is ordered that Justice of the Peace Herbert G. Williams, Jr., be publicly censured for violating Canons 1, 2(A), 2(B), 3(A)(1), and 3(B)(1) of the Code of Judicial Conduct. It is further ordered that Justice of the Peace Herbert G. Williams, Jr., reimburse the Judiciary Commission of Louisiana $1,657.56 in costs.
VICTORY, J., dissents.
I dissent and would impose a harsher sanction.
NOTES
[1] JP Williams, who is presently 81 years of age, was first elected as a justice of the peace in 1997 and assumed his office on January 1, 1998. Thereafter, he was re-elected twice, including most recently in 2008, for a term of office commencing on January 1, 2009. Since the year 2008, there has been a maximum qualification age of 70 for justices of the peace. See La. R.S. 13:2582(A)(2)(a). However, those persons who were serving as a justice of the peace or elected to the office of justice of the peace on or before August 15, 2006, are excluded from this age requirement. See La. R.S. 13:2582(A)(2)(b).

JP Williams is not an attorney and never qualified to be a notary public with full authority under La. R.S. 35:1, et seq.
[2] A separate file was opened when Mr. Larche filed a complaint with the Commission regarding the act of donation.
[3] See La. R.S. 13:2586.1(B)(1) (as an ex officio notary public, JP Williams did not have authority to "[r]eceive or notarize any document effecting, transferring, conveying, encumbering, or mortgaging immovable property.").
[4] Canon 1 requires that a judge uphold the integrity and independence of the judiciary. Canon 2(A) commands that a judge respect and comply with the law and act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. Canon 2(B) provides that a judge shall not allow family or other relationships to influence judicial conduct or judgment, nor shall a judge lend the prestige of his judicial office to advance the private interest of the judge or others. According to Canon 3(A)(1), a judge shall be faithful to the law and maintain professional competence in it, while Canon 3(B)(1) requires that a judge diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration.
[5] JP Williams attended the attorney general's training program in 1997, 1999, 2001, 2003, and subsequent years, which fulfilled the attendance requirements of La. R.S. 49:251.1(B). However, the program agendas for those years do not include a specific reference to notarial duties of a justice of the peace.
[6] The signature purporting to be that of the Donor is illegible, and there is no name typed below the signature indicating the name of the Donor.
[7] There is no indication that any criminal charges were ever brought against JP Williams as a result of his actions.
[8] See La. R.S. 13:2586.1(B)(1).
[9] JP Williams objected to this finding, contending there is no evidence that he believed the Donor's signature was invalid at the time he notarized the act of donation. The Commission acknowledged this may be true, but stated:

[T]he fact remains that someone forged what purported to be Mr. Larche's signature, but was not, to a legal document falsely representing that he was donating land to relatives of JP Williams. JP Williams' lack of familiarity with the limitations imposed upon him as an ex officio notary, and his willingness to make an exception to the rule he did knowthat he should not notarize any document that was not signed in [his] presencecontributed to the negative consequences to Mr. Larché.
[10] It appears from the public records of Plaquemines Parish that title to the property was still in the name of Mr. Larche's deceased parents. Nevertheless, for purposes of this proceeding, the Commission found it is irrelevant how the title to the property appeared in the public records when JP Williams notarized the donation, as neither Mr. Larche nor anyone else purporting to be the Donor signed the document in JP Williams' presence.
[11] Since the codal violations were sufficiently serious to warrant a recommendation of public discipline, the hearing officer did not determine whether JP Williams' conduct also violated the provisions of La. Const. art. V, § 25(C) (pertaining to "willful misconduct relating to his official duty"), as charged. The Commission likewise declined to make such a finding.
[12] La. Const. art. V, § 25(C) provides:

On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony. On recommendation of the judiciary commission, the supreme court may disqualify a judge from exercising any judicial function, without loss of salary, during pendency of proceedings in the supreme court. On recommendation of the judiciary commission, the supreme court may retire involuntarily a judge for disability that seriously interferes with the performance of his duties and that is or is likely to become permanent. The supreme court shall make rules implementing this Section and providing for confidentiality and privilege of commission proceedings.
[13] As previously mentioned, the Commission's formal charge against JP Williams alleged violations of Canons 1, 2(A), 2(B), 3(A)(1), and 3(B)(1).
[14] "[A] judge may also, through negligence or ignorance not amounting to bad faith, behave in a manner prejudicial to the administration of justice so as to bring the judicial office into disrepute." Hunter, 823 So.2d at 336, quoting In re Quick, 553 So.2d 522, 524 (Miss. 1989).
[15] A transfer of immovable property must be made by authentic act or by act under private signature. La. C.C. art. 1839. An authentic act is a writing executed before a notary public or other officer authorized to perform that function, in the presence of two witnesses, and signed by each party who executed it, by each witness, and by each notary public before whom it was executed. La. C.C. art. 1833(A).
[16] The non-exclusive list of factors to be considered by a court in imposing discipline on a judge are:

"(a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires."
Chaisson, 549 So.2d at 266, quoting Matter of Deming, 108 Wash.2d 82, 736 P.2d 639, 659 (1987).
[17] The Office of Special Counsel had urged the Commission to recommend a 60-day suspension without pay in this case.