769 So.2d 1186 (2000)
In re Justice of the Peace Guy McINNIS.
No. 2000-O-1026.
Supreme Court of Louisiana.
October 17, 2000.
*1187 Nancy E. Rix, Commission Legal Counsel, Hugh M. Collins, PhD., Chief Executive Officer, Judiciary commission of Louisiana.
Steven Robert Scheckman, Special Counsel, Mary Whitney, Assistant Special Counsel, Office of Special Counsel.
Gilbert Victor Andry, IV, New Orleans, Counsel for Respondent.
CALOGERO, Chief Justice.
This matter comes before the court on the recommendation of the Judiciary Commission of Louisiana that Guy S. McInnis, Justice of the Peace for Ward I, St. Bernard Parish, be censured for misconduct and ordered to reimburse the Commission the costs incurred in the investigation and prosecution of this judge discipline case. The Commission conducted an investigatory hearing, made findings of fact and conclusions of law, and determined that respondent violated Article V, § 25(C) of the 1974 Louisiana Constitution[1] and Canons 1, 2(A), and 5(C)(1) of *1188 the Code of Judicial Conduct[2] by maintaining a continuing financial relationship with the St. Bernard Parish Sheriff's Office after he knew, or should have known, that such a relationship violated the Code of Judicial Conduct. After reviewing the record, we find that the charge against Justice of the Peace McInnis is supported by clear and convincing evidence. We agree with the Commission that Justice of the Peace McInnis's behavior warrants censure and an assessment of costs.

FACTS
Justice of the Peace Guy McInnis assumed the office of Justice of the Peace of Ward I in St. Bernard Parish on January 1, 1997. At that time, Justice of the Peace McInnis was, and had been since January 1995, employed as a full-time accountant for the St. Bernard Parish Sheriff's Office. Although he did not exercise law enforcement powers, Justice of the Peace McInnis was also a commissioned deputy sheriff for the purpose of obtaining retirement benefits. As Justice of the Peace, respondent's duties included issuing warrants of arrest, which were then executed by the St. Bernard Parish Sheriff's Office, and setting bonds.[3] On two occasions while *1189 respondent was employed by the sheriff's office, the arrest warrants were initiated by affidavits from sheriff's deputies.
In April 1997, the Commission received an anonymous complaint asserting that Justice of the Peace McInnis was employed both as a justice of the peace and by the St. Bernard Parish Sheriff's Office. The Commission then informed respondent of the complaint and invited a response. By letter of April 30, 1997, Justice of the Peace McInnis stated to Special Counsel Steve Scheckman that he was employed by the St. Bernard Parish Sheriff's Office as an accountant, that he had no law enforcement powers, and that he was commissioned a deputy sheriff so as to participate in the pension plan. Respondent further stated that he intended to cooperate fully in the investigation and to abide by the wishes of the Commission. In August 1997, the Commission through its legal counsel, Ms. Nancy Rix, advised respondent in writing that his employment with the sheriff's office at the same time he was serving as a justice of the peace was inconsistent with Canon 2(A) of the Code of Judicial Conduct, referencing two advisory ethics opinions issued by the Supreme Court Committee on Judicial Ethics that had been provided to respondent by Special Counsel.[4] The Commission's legal counsel further informed respondent that the Commission would file formal charges if respondent did not resign either from his office as justice of the peace or from his position with the St. Bernard Parish Sheriff's Office.
On September 5, 1997, respondent through his counsel, Jacques Sanborn, proposed to the Commission through its legal counsel that respondent resign his commission as a deputy sheriff but retain his position as an accountant in the civil section of the sheriff's office. That proposal, merely to resign as a deputy sheriff, was deemed insufficient by the Commission, whose legal counsel in a letter dated September 19, 1997, advised respondent that, if he wished to retain his position as a justice of the peace, he "should terminate [his] relationship with the sheriff's office altogether."[5] By letter dated October 1, *1190 1997, respondent advised special counsel that he had submitted a letter of resignation to the sheriff's office effective October 31, 1997. Thereafter, the Commission informed respondent that, in reliance upon his resignation letter, it had voted to close the matter.
Prior to the effective date of his resignation, October 31, 1997, respondent contacted a friend, Steve Kissee, who is an accountant. Respondent arranged to have Mr. Kissee, through Mr. Kissee's wholly-owned corporation, Accounting Systems Consulting of Louisiana (ASC), enter into a contract to provide the sheriff's office with accounting services commencing on November 1, 1997.[6] In an unwritten agreement, Mr. Kissee's corporation, ASC, then contracted with Justice of the Peace McInnis through McInnis's wholly-owned corporation, GSM Financial Services, Inc. (GSM), to perform the accounting work for the sheriff's office.[7] Mr. Kissee testified that the sheriff's office understood that primarily Justice of the Peace McInnis would perform the actual work.
On November 1, 1997, the day after his resignation from the sheriff's office, Justice of the Peace McInnis began performing the accounting work for the sheriff's office as an employee of his wholly-owned corporation, GSM, an independent subcontractor, which was paid by ASC, Mr. Kissee's corporation, to perform such services. ASC had only one account, the sheriff's office, which paid ASC $3,334.00 per month. In turn, ASC paid GSM approximately $3,200.00 per month, or $38,400.00 per year, an amount that was roughly equivalent to respondent's annual salary at the time of his resignation, $33,400.00 with benefits.[8] Until December 31, 1998, Justice of the Peace McInnis performed the accounting work for the St. Bernard Parish Sheriff's Office at the St. Bernard Parish Sheriff's Office, where he maintained an office.
On August 20, 1998, the Commission, through the Office of Special Counsel, informed Justice of the Peace McInnis of a second anonymous complaint, received in July of 1998, which alleged that he continued to be employed as an accountant for the sheriff's office. Justice of the Peace McInnis responded four days later by sending to Special Counsel, via facsimile, copies of his resignation letter of October 1997 and a completed application for refund of his retirement contributions dated November 7, 1997. Justice of the Peace McInnis's response made no mention of his continuing financial relationship with the sheriff's office through contracts with ASC and GSM.
In December of 1998, after Justice of the Peace McInnis was notified that the Commission had authorized an investigation against him, he informed the sheriff's office that he would no longer provide accounting services on a contractual basis. The sheriff's office then discontinued its contractual relationship with ASC. Thereafter, the sheriff's office hired a full-time accountant unrelated to ASC, GSM, or respondent. However, on February 1, 1999, Justice of the Peace McInnis, through GSM, entered into a twelve-month, personal *1191 services contract with the sheriff's office. Under this new agreement, respondent provided support services, which included training the new accountant. Respondent was paid $500.00 per month. On July 26, 1999, the Commission filed Formal Charge No. 106 against Justice of the Peace McInnis. Approximately two months later, on September 21, 1999, respondent terminated his personal services contract with the sheriff's office.

FORMAL CHARGE No. 106
The Commission charged that Justice of the Peace McInnis maintained an ongoing employment or financial relationship with the St. Bernard Parish Sheriff's Office after taking office as Justice of the Peace of Ward I, St. Bernard Parish. The charge alleged that respondent, prior to the effective date of his resignation from the sheriff's office, had arranged to have Mr. Kissee's corporation, ASC, enter into a contract with the sheriff's office to provide it with accounting services. ASC thereafter hired respondent's corporation to perform that accounting work. The charge also alleged that respondent, when confronted with the second anonymous complaint, replied with copies of his resignation letter and retirement contributions refund application. The Commission further alleged that respondent did not disclose his continuing business relationship with the sheriff's office until his sworn statement of April 5, 1999. The charge asserted that respondent had violated Canons 1, 2(A), and 5(C)(1) of the Code of Judicial Conduct, engaged in willful misconduct relating to his official duty, in violation of La. Const. art. V, § 25(C), and engaged in public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, also in violation of La. Const. art. V, § 25(C).

PROCEEDINGS BEFORE THE COMMISSION
The Commission conducted an investigatory hearing and heard the testimony of Mr. John Lane, Director of Administration for the St. Bernard Parish Sheriff's Office; Mr. Steve Kissee; and Justice of the Peace Guy McInnis.
Justice of the Peace McInnis through his counsel stipulated that he had contacted Mr. Kissee before his resignation took effect and asked Mr. Kissee to enter into an arrangement with the sheriff's office with the understanding that Mr. Kissee's corporation would hire Mr. McInnis or his company to perform all of the accounting work for the sheriff's office. Respondent also stipulated that the sheriff's office was aware that respondent was the person who would perform the accounting work under Mr. Kissee's contract with the sheriff's office. Respondent further stipulated that no written agreement existed between ASC and GSM, that he and Mr. Kissee had an understanding from the beginning that respondent would perform all of the work, and that respondent in fact performed all of the accounting work for the sheriff's office under its contract with ASC. Finally, respondent stipulated that the sheriff's office ceased being a client of ASC in January of 1999 and that ASC obtained no other contracts with the sheriff's office.
Mr. Lane testified that, when respondent did resign in October of 1997, the sheriff's office would have been inconvenienced had respondent immediately ceased performing the office's accounting work. The sheriff's office consequently entered into an agreement with Mr. Kissee to supply someone to continue the accounting work until a permanent replacement could be hired. When asked by a Commission member why the sheriff's office did not contract directly with respondent McInnis, Mr. Lane responded, "I think Guy [Justice of the Peace McInnis] told the sheriff or somebody that they had a problem with ___ the judiciary was questioning it, whether he could serve or not."[9]
*1192 Mr. Kissee testified that respondent's connections with the sheriff's office "probably played a part" in obtaining the contract with the sheriff's office, a contract Mr. Kissee had failed to win some years earlier. Mr. Kissee stopped providing accounting services to the sheriff's office when respondent ceased performing that work. Mr. Kissee explained that he had no indication that respondent was trying to conceal the contractual relationship with the sheriff's office, because, under the contract between ASC and the sheriff's office, respondent was required to be on the sheriff's office premises. Mr. Kissee testified that he had an understanding with the sheriff's office that respondent would primarily be the person performing the accounting work, given that respondent was a "natural fit" based on his experience with the computer software used by the sheriff's office. Mr. Kissee explained that, as the work proceeded and it became apparent that respondent was performing the same work each month, he and respondent came to an agreement that Mr. Kissee would pay respondent $3,200.00 each month, out of the contracted $3,334.00, and that Mr. Kissee would retain the difference of $134.00 for his miscellaneous services and costs.
At the Commission hearing, respondent testified as to his duties as a justice of the peace, acknowledging that he is responsible for issuing warrants of arrest for certain offenses, that the warrants issued are turned over to the sheriff's office for execution, and that on two occasions he issued arrest warrants based upon the affidavits of deputy sheriff's. Respondent generally denied conducting any of his justice of the peace duties from his office within the sheriff's office, but he conceded that he "might have made some phone calls from [his] office" and occasionally "had discussions with people."
Justice of the Peace McInnis testified that he did not try to conceal his contractual relationship with the sheriff's office. After October 31, 1997, he continued to perform the accounting services on the sheriff's office premises in an open manner. He pointed out that, prior to entering the contract with the sheriff's office with ASC, he unsuccessfully sought advice from both Nancy Rix, the Commission's Legal Counsel, and Steve Scheckman, Special Counsel, as to whether he could ethically enter into a contractual relationship with the sheriff's office. Respondent testified that Mr. Scheckman said that he could not give respondent that advice. Respondent explained that both Mr. Scheckman and Ms. Rix told him that he could seek an advisory opinion from the Supreme Court Committee on Judicial Ethics. Respondent explained that, although Mr. Scheckman indicated he would give respondent time to obtain an opinion, he (respondent) did not think that "a couple of months" would have been "acceptable" to Mr. Scheckman and concluded that he "didn't have that time."[10] Respondent did explain that he was confused as to which commission body issued such advisory opinions; however, he admitted at the hearing that he never sought such an opinion even after Mr. Scheckman and Ms. Rix told him that he could do so.
Respondent denied, as was alleged in the formal charge, that he failed to disclose his contractual arrangement with ASC and the sheriff's office until he gave a sworn statement on April 5, 1999. He testified that, after he received the August *1193 20, 1998 letter from Special Counsel informing him of the second anonymous complaint, he called the Office of the Special Counsel and spoke with Assistant Special Counsel Mary Whitney. He asked Ms. Whitney what additional documentation she wanted, given that he had already provided a copy of his October 1997 resignation letter.[11] In that conversation, respondent asked Ms. Whitney if he could have a contract with the sheriff's office. According to respondent, Ms. Whitney replied that respondent was "pushing the line" and that it would depend on the money amount of the contract, "thousands or hundreds" of dollars. Respondent also testified that he told Ms. Whitney during that same conversation shortly after August 20, 1998, that he was still doing the accounting work at the sheriff's office for Mr. Kissee. Asked whether he had told Special Counsel that he had a contract with the sheriff's office, respondent explained that he told Ms. Whitney that he "indirectly had a contract with the sheriff's office with Mr. Kissee."
Respondent maintained that he was never told that it was ethically impermissible for him to enter a contractual relationship with the sheriff's office and that, had the Commission or Special Counsel told him otherwise, he would have terminated the contract with the sheriff's office immediately. He stated that it was not until Ms. Whitney told him that he could infer from the formal charge, filed on July 26, 1999, whether or not such a relationship was permissible, that he was aware that such a relationship was not permitted. He then terminated his personal services contract with the sheriff's office on or about September 21, 1999.

THE JUDICIARY COMMISSION'S FINDINGS AND CONCLUSIONS
The Commission found that respondent had not disclosed his contractual relationship with the sheriff's office, a relationship that had commenced on November 1, 1997, until respondent gave a sworn statement in April of 1999 during the course of the Commission's investigation. Furthermore, the Commission characterized respondent's reply to the second anonymous complaint, consisting of copies of the employment resignation letter and the retirement contribution refund application, as misleading.
The Commission concluded that respondent violated Canons 1, 2(A), and 5(C)(1) of the Code of Judicial Conduct by maintaining a financial relationship with the sheriff's officefirst as a full-time employee and commissioned deputy and then as an independent contractorwhile a sitting justice of the peace, and after he was advised and knew, or should have known, that such a relationship was a violation of the Code. The Commission found that Justice of the Peace McInnis's arrangements with the sheriff's office resulted in a continuous flow of money between the parties, creating actual impropriety and the appearance of impropriety. Moreover, respondent went to great lengths to maintain his financial relationship with the sheriff's office. Even after the Commission authorized an investigation into the second anonymous complaint against Justice of the Peace McInnis, he entered into another financial transaction with the sheriff's office to provide consulting services. The Commission concluded that respondent persisted in his financial arrangements with the sheriff's office and failed to comprehend, or refused to acknowledge, that his actions were improper.
The Commission also determined that respondent's conduct constituted willful misconduct relating to his official duty, a violation of La. Const. art. V, § 25(C). The Code of Judicial Conduct imposed upon respondent a duty to remain impartial and to avoid business and financial *1194 dealings that would call that impartiality into question. His continuing financial relationship with the sheriff's office, especially after the Commission advised him that such a relationship was problematic, constituted willful misconduct. Furthermore, respondent's conduct violated the prohibition in La. Const. art. V, § 25(C) against public conduct prejudicial to the administration of justice that brings the judicial office into disrepute. The Commission found that respondent maintained an office at the sheriff's office even after he was no longer an employee; consequently, persons who came into contact with respondent could have observed his continuing and close relationship with law enforcement.
The Commission concluded that the formal charge was proven by clear and convincing evidence. The Commission, after reviewing the factors set forth in In re Chaisson, 549 So.2d 259 (La.1989), recommended that respondent be censured and ordered to reimburse the Commission for costs.

REVIEW
The respondent initially questions the fairness of the judicial disciplinary process, generally alleging that the Judiciary Commission is presented only with Special Counsel's side of the case, that the Commission's legal counsel "is the friends [sic] of and works on a daily basis with Special Counsel," and that the Commission acts as a grand jury with both its legal counsel and Special Counsel functioning as prosecutors. The respondent contends that he has been treated unfairly and that he has been "over-prosecuted."
This court, however, has repeatedly rejected similar claims that the procedures implemented by the Judiciary Commission violate the respondent's right to due process of law. See In re Bowers, 98-1735, p. 9 (La.12/1/98), 721 So.2d 875, 880-81; In re Johnson, 96-1866, p. 15 (La.11/25/96), 683 So.2d 1196, 1202; In re Whitaker, 463 So.2d 1291, 1296 (La.1985); In re Haggerty, 257 La. 1, 12, 241 So.2d 469, 472 (1970). In Allen v. State Bd. of Dentistry, 543 So.2d 908, 914 (La.1989), we recognized the due process infirmity when a disciplinary board's attorney acts as both an internal advisor or counsel and the board's prosecutor. However, in In re Bowers, we specifically pointed out the separate and distinct roles of the Judiciary Commission's staff counsel and the Office of Special Counsel, noting that ex parte communications between them are prohibited by the Rules of the Judiciary Commission. In re Bowers, 98-1735, p. 9, 721 So.2d at 880. We further emphasized that the Commission does not adjudicate cases of alleged judicial misconduct; rather, the Commission submits proposed findings and recommendations for discipline to this court for adjudication. Id., pp. 8-9, 721 So.2d at 880. Moreover, the Commission has the authority only to investigate disciplinary cases within the judiciary and to recommend disciplinary action. In re Whitaker, 463 So.2d at 1296. The Commission is not required to afford a respondent the full due process rights owed an accused in a criminal prosecution; instead, the Commission need only provide the minimum standards of due process contained in its own rules and in the Supreme Court Rules for a full and fair hearing. Id. Our review of the record shows that the respondent here has been afforded adequate and sufficient due process of law under Allen. See In re Bowers, 98-1735, p. 9, 721 So.2d at 881; In re Johnson, 96-1866, p. 15, 683 So.2d at 1201.
We now turn to the merits of the formal charge against Justice of the Peace McInnis. The respondent first contends that the formal charge as written does not allege a "contractual" relationship with the sheriff's office and that the charge does not support the action against him because "[s]uch a relationship was not and is not a violation of any Canon or rule governing the conduct of Justices of the Peace in this state." He also contends that the charges *1195 against him were not proven by clear and convincing evidence.
Though not couched as such, respondent appears to argue that he has not been provided fair and adequate notice of the charge against him. Without question, procedural due process and the Rules of this court require a judge, before the formal hearing, be given fair notice of the charge upon which the Commission seeks to recommend discipline. In re Quirk, 97-1143, p. 21 (La.12/12/97), 705 So.2d 172, 187. Absent such notice, a judge cannot adequately prepare for or defend against the allegations of misconduct. Id. Consequently, this court will not address conduct found by the Commission to be in violation of the Code of Judicial Conduct or La. Const. art. V, § 25 where a judge has not been given fair notice of that conduct in the formal charge. Id.
Here, respondent was given fair and adequate notice that he had engaged in impermissible "financial and business dealings" with the sheriff's office, conduct that the Commission found had violated Canons 1, 2(A), and 5(C)(1) of the Code of Judicial Conduct and Article V, § 25(C) of the Louisiana Constitution. Although Formal Charge No. 106 does not contain the phrase "contractual relationship" in any of the allegations, it specifically alleges in Paragraph A that respondent "maintained an ongoing employment or financial relationship with the St. Bernard Parish Sheriff's Office after taking office as Justice of the Peace of Ward I, St. Bernard Parish." Formal Charge No. 106, para. A (emphasis added). In Paragraphs A(2) and (4)-(7), the charge first references respondent's employment relationship with the sheriff's office and the circumstances precipitating his eventual resignation from his position as an accountant.[12] The charge in Paragraphs A(8) through A(13) then alleges with specificity that respondent had a "continuing business relationship" with the sheriff's office under two different agreements after his resignation from employment with the sheriff's office. First, the charge alleges that respondent continued to perform the accounting work for the sheriff's office after his resignation under the contract between the sheriff's office and Mr. Kissee's corporation, ASC. See Formal Charge No. 106, paras. A(8) & (9). The charge alleges that respondent arranged this contract and that Mr. Kissee then hired respondent through his own corporation, GSM, to perform the work under that contract. See Id., para. A(8). Second, the charge asserts that, after respondent discontinued performing the accounting work under the contract between the sheriff's office and ASC, respondent through GSM "entered into a contract ... with the St. Bernard Parish Sheriff's Office" to provide training services to the *1196 sheriff's office for one year. Id., paras. A(12) & (13). With these allegations, the charge sufficiently sets forth a complaint that respondent engaged in "financial and business dealings" prohibited by Canon 5(C)(1).
We also conclude that the allegations in the formal charge, as shown by clear and convincing evidence in the record, constituted a violation of the Code of Judicial Conduct. Respondent maintains that neither Special Counsel nor the Commission can point to a rule or legal opinion that prohibits a contractual relationship between a sheriff and the justice of the peace. However, Canon 5 of the Code of Judicial Conduct instructs a judge to regulate his or her extra-judicial activities so as to minimize any risk of conflict with the judge's judicial duties. Canon 5(C)(1), in pertinent part, specifically provides that the judge "shall refrain from financial and business dealings that tend to reflect adversely on the judge's impartiality ... or involve the judge in frequent transactions with lawyers or persons likely to come before the court on which he or she serves." Canon 5(C)(1), Code of Judicial Conduct (emphasis added). It is beyond dispute that a contract for services in exchange for monetary remuneration between the sheriff's office and a justice of the peace is a "financial and business dealing" within the meaning of this Canon. It is also beyond dispute that respondent entered into two financial or business relationships with the sheriff's office after his resignation as an accountant in that office, first as a subcontractor and then as a personal services contractor.
The question then is whether these ongoing financial or business dealings between respondent and the sheriff's office are ones that "tend to reflect adversely on the judge's impartiality ... or involve the judge in frequent transactions with lawyers or persons likely to come before the court on which he or she serves." A business relationship wherein the justice of the peace derives a substantial portion of his income from the sheriff's office creates an appearance of, if not actual, impropriety and partiality. In In re Johnson, 96-1866, pp. 10-11, 683 So.2d at 1200, we found that the judge's contract with the sheriff's office in which the judge received significant sums of money for the operation and management of an inmate pay telephone system in the parish jail, a facility operated by the sheriff, "cast doubt on the impartiality and independence of the court and [was] prejudicial to the administration of justice." We reasoned that this "financial scheme involve[d] a continuous flow of money" from the parish prison to the judge through the sheriff "as a conduit, creating both an actual and appearance of impropriety." Id., 96-1866, p. 11, 683 So.2d at 1200. More specifically, we stated,
The judiciary, the sheriff and the prisons are all indispensable, separate components of our system of justice. There should be no financial dealing, bargaining and profiteering among these justice system components.
Id., 96-1866, p. 13, 683 So.2d at 1201.
Justice of the Peace McInnis's financial arrangements with the sheriff's office certainly do not rise to the level of egregiousness found in the Johnson case. Nonetheless, our reasoning in Johnson reinforces the conclusion that a financial or business relationship between a justice of the peace and the sheriff necessarily tends to reflect adversely on the impartiality of the justice of the peace. At a minimum, such a relationship gives the appearance of impropriety and partiality.
Furthermore, there can be no doubt that an ongoing business relationship between the sheriff and the justice of the peace tended to involve the justice of the peace "in frequent transactions with lawyers or persons likely to come before the court on which he or she serves." Here, under the contract between the sheriff's office and Mr. Kissee, the respondent worked the same hours he did as a full-time sheriff's employee. Thus, he was involved with the *1197 sheriff's office, whose law enforcement personnel on two occasions appeared before the justice of the peace to swear out affidavits forming the bases of warrants for arrest subsequently issued by the justice of the peace. Given that sheriff's deputies have actually appeared before Justice of the Peace McInnis on two occasions, it is certainly "likely," if not very often, that sheriff's office personnel would appear before respondent's court.[13]
The respondent vigorously disputes the Commission's factual finding that he failed to disclose the entire arrangement between the sheriff's office, ASC, and GSM until April 5, 1999, and its conclusion that he misled the Commission as to the existence of a continuing financial relationship with the sheriff's office after his resignation. The respondent further maintains that he could not have intentionally violated the Code of Judicial Conduct because he told both Special Counsel and the Commission's legal counsel that he intended to enter into a contract with the sheriff's office and that he did in fact enter into a contract with the sheriff's office. He points out that he openly and obviously worked in the sheriff's office and that he kept an office there. He maintains that Ms. Rix told him that "it was a grey area," that Mr. Scheckman told him "it was a grey area of the law but probably proper," and that Ms. Whitney stated "it would depend on how much money is involved." Finally, respondent asks what more he could have done and asserts that he would have done anything that the Commission or Special Counsel told him to do.
Respondent's assertion that, prior to his sworn statement of April 5, 1999, he disclosed either to the Commission or to the Office of Special Counsel that he had actually entered into a contractual relationship with the sheriff's office commencing on November 1, 1997, is not supported by his own testimony. At the most, he queried Special Counsel and/or the Commission's legal counsel whether a contract with the sheriff's office would be ethically permissible. His own testimony does not establish that he told the Commission either prior to October 31, 1997, or shortly after August 20, 1998, that he had actually entered into a contractual relationship with the sheriff's office.
The testimony showed that, prior to the effective date of his resignation, respondent did contact both the Commission's legal counsel, Ms. Rix, and Special Counsel Steve Scheckman. Respondent made only one written proposal to the Commission, to resign his commission as a deputy sheriff but remain a civilian employee, and that proposal was rejected. With regard to a contractual arrangement, respondent asked both Ms. Rix and Mr. Scheckman whether he could enter into a contract with the sheriff's office. According to respondent's own testimony, Ms. Rix and Mr. Scheckman told him that he could seek an advisory opinion from the Supreme Court Committee on Judicial Ethics. Respondent did not seek such an opinion because he did not believe he had enough time. Nowhere in his testimony before the Commission does respondent state that he told Ms. Rix or Mr. Scheckman that he had actually entered into a contract with the sheriff's office to provide accounting services commencing on November 1, 1997.
Furthermore, respondent did not testify before the Commission that Special Counsel Scheckman told him a contract with the sheriff's office was "probably proper." In fact, both Ms. Rix and Mr. Scheckman expressly declined to give respondent advice except to tell him where he could obtain an advisory opinion on his question. Clearly, however, respondent, who was then represented by counsel and was aware of the two ethics opinions concerning *1198 justices of the peace, as well as the Johnson opinion by this court, was on notice that an accounting services contract with the sheriff's office was ethically problematic or, as respondent characterizes it, fell within a "grey area."
As for Assistant Special Counsel Mary Whitney, according to respondent's own testimony, he first told her that he was still performing accounting work for the sheriff's office after receiving Special Counsel's letter of August 20, 1998, informing him of the second anonymous complaint. Respondent testified that he told Ms. Whitney that he was at the sheriff's office performing accounting work for Mr. Kissee. Respondent was careful to say that he told Ms. Whitney that he "indirectly had a contract with the sheriff with Mr. Kissee." It was during this conversation that respondent says he asked Ms. Whitney whether he could contract directly with the sheriff's office. According to respondent, Ms. Whitney told him that she could not give him advice and that he was "pushing the line," but that it would depend on the amount of money involved, "thousands or hundreds." Respondent's written response to Special Counsel's letter of August 20, 1998, however, included only a copy of his October resignation letter and a copy of his pension contribution refund application. It made no mention of an ongoing financial, business, or contractual relationship with the sheriff's office. Respondent was less than candid in both his written and oral responses to Special Counsel's letter of August 20, 1998, informing him of the second complaint. On this evidence, the Commission was not manifestly erroneous in finding that respondent did not disclose his "entire arrangement" with the sheriff's office until his sworn statement of April 5, 1999.
The fundamental tenet underlying the Code of Judicial Conduct is the independence and impartiality of the judiciary. In re Johnson, 96-1866, p. 11, 683 So.2d at 1200. Canons 1, 2, and 5(C), imbued as they are with this fundamental tenet, "endeavor to safeguard the integrity and honor of the judiciary." Id. In keeping with these goals, this court has admonished that "[t]he off-bench behavior of a judge should not only be above reproach but such as to inspire confidence of the public in the judiciary." Id., 96-1866, p. 11, 683 So.2d at 1200-01 (quoting In re Haggerty, 257 La. 1, 29, 241 So.2d 469, 478 (1970)). As we have explained:
Judges are not merely elected public officials. Their role in the administration of justice makes them a special breed. The administration of justice requires adherence by the judiciary to the highest ideals of personal and official conduct. If judges openly flaunt the legal and constitutionally sanctioned and adopted Canons of the Code of Judicial Conduct, there is no question but that such persistent and public conduct is prejudicial to the administration of justice and that it does bring the judicial office into disrepute.
In re Babineaux, 346 So.2d 676, 681 (La. 1977).
The Canons allow judges to conduct business, and to make a profit from that business, so long as the judge's business interests do not reflect adversely on his or her impartiality or involve the judge in frequent transactions with persons likely to come before his court. See In re Johnson, 96-1866, pp. 11-12, 683 So.2d at 1201. Here, Justice of the Peace McInnis was an employee of the sheriff's office before he assumed the office of justice of the peace. Although respondent did resign when the Commission informed him that his continued employment with the sheriff's office while holding the office of justice of the peace was improper, it was respondent's efforts to continue a financial or business relationship with the sheriff's office even after his resignation, when he knew or should have known that such a relationship was not permitted by the Code of Judicial Conduct, that violated the Code's mandates.
*1199 Having found that respondent's conduct did violate the Code of Judicial Conduct we next turn to the appropriate sanction to impose. The Commission recommended that respondent be censured and ordered to pay costs. The Office of the Special Counsel now agrees with that recommendation.
The following non-exclusive list of factors has been adopted by this Court when considering the imposition of discipline on a judge:
(a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.
In re Chaisson, 549 So.2d 259, 266 (La. 1989) (quoting Matter of Deming, 108 Wash.2d 82, 736 P.2d 639, 659 (1987)).
In this case, Justice of the Peace McInnis entered into not one but two, successive, ethically-impermissible financial arrangements with the sheriff's office after resigning from an employment relationship with that office upon the Judiciary Commission's request. The nature and extent of respondent's behavior causes us concern, given that he could have sought an opinion from the Supreme Court Committee on Judicial Ethics, but chose not to do so despite his assertion that he would have complied with any request of either Special Counsel or the Commission. Respondent's claim that he detrimentally relied upon the advice of Special Counsel or the Commission's legal counsel has not been demonstrated. Nonetheless, respondent's misconduct did not occur either in his courtroom or in his official capacity as a justice of the peace.
Although it is not clear that respondent has fully acknowledged his misconduct, he discontinued his financial relationship with the sheriff's office prior to the hearing before the Commission. At the time of his ethically-impermissible financial relationship with the sheriff's office, respondent was a relatively new justice of the peace, and, except for the employment relationship, from which he resigned, there have been no other complaints about him. Additionally, we note that the behavior at issue did not involve an attempt by respondent to exploit his position as a justice of the peace; however, there can be no doubt that respondent earned a substantial portion of his income from his financial relationships with the sheriff's office.
Another mitigating factor is that the respondent, as the Judiciary Commission noted in determining its recommendation, was a non-lawyer member of the judiciary and had virtually no formal legal training. Moreover, while he improperly tried to distance himself contractually in his business relationship with the sheriff's office, he did not hide himself in performing the contractual work, but continued to work openly in the same office under a different financial arrangement.
Nonetheless, we cannot deny the negative effect on the integrity and respect for the judiciary of an ethically-impermissible financial or business relationship between the sheriff and a justice of the peace in the same parish. It is this aspect of respondent's misconduct that is most troubling. In the typical criminal matter before Justice of the Peace McInnis, as evidenced by the warrants of arrest introduced at the hearing, the victim affiant and the accused are frequently involved in domestic disputes either of violence or neglect of *1200 family. To every individual who finds himself confronted by the power of the state the impartiality of the judiciary is of paramount importance. Consequently, when the line between the judiciary and the law enforcement arm of the executive branch is blurred, the individual's confidence in our system of laws and justice may be irreparably harmed. Recognizing the seriousness of the misconduct in relation to the particular office, we find that censure is the appropriate disciplinary action to punish Justice of the Peace McInnis for his misconduct.

DECREE
Therefore, it is hereby ordered that respondent, Justice of the Peace Guy McInnis, Ward I, Parish of St. Bernard, be censured for knowingly and willfully maintaining a continuing financial relationship with the St. Bernard Parish Sheriff's Office, a violation of Canons 1, 2(A), and 5(C)(1) of the Code of Judicial Conduct. Respondent is cast with costs of this proceeding, and shall pay to the Judiciary Commission of Louisiana the sum of $1,474.00 as reimbursement for expenses incurred by the Commission during its investigation and prosecution of this case. Supreme Court Rule XXIII, § 22.
NOTES
[1] Article V, § 25(C) of the 1974 Louisiana Constitution provides in pertinent part:

On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony.
[2] The Code of Judicial Conduct adopted by this court in 1976 under its supervisory authority supplements the Constitution's substantive grounds for disciplinary action against a judge. See In re Babineaux, 346 So.2d 676, 678 (La.1977). The Code is binding on all judges, including justices of the peace, see In re Wilkes, 403 So.2d 35, 40 (La.1981), and violations of the Canons provided by this Code can serve as a basis for the disciplinary action provided for by Article V, § 25(C) of the Constitution.

Canon 1, entitled "A Judge Shall Uphold the Integrity and Independence of the Judiciary," provides:
An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and shall personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective. As a necessary corollary, the judge must be protected in the exercise of judicial independence. Canon 2, entitled "A Judge Shall Avoid
Impropriety and the Appearance of Impropriety in All Activities," provides in subsection A:
A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
Canon 5, entitled "A Judge Shall Regulate Extra-Judicial Activities to Minimize Risk of Conflict with Judicial Duties," provides in subsection C(1):
A judge shall refrain from financial and business dealings that tend to reflect adversely on the judge's impartiality, interfere with the proper performance of judicial duties, exploit the judge's judicial position, or involve the judge in frequent transactions with lawyers or persons likely to come before the court on which he or she serves.
[3] The jurisdiction and authority of a justice of the peace is circumscribed by statute. A justice of the peace has criminal jurisdiction as a committing magistrate. La.Rev.Stat. 13:2586(C)(1); see also La.Code Crim. Proc. art. 931. As such, he or she has the authority to issue either a summons, La.Code Crim. Proc. art. 209, or a warrant of arrest, when the person making a complaint executes an affidavit and the justice has probable cause to believe that an offense was committed and that the person against whom the complaint was made committed it, La.Code Crim. Proc. art. 202. A warrant of arrest must be executed by a peace officer having authority in the territorial jurisdiction in which the person is to be found. La.Code Crim. Proc. art. 204. However, a justice of the peace may not issue a warrant of arrest for a peace officer for acts performed in the course and scope of his or her official duties. La.Rev.Stat. 13:2586(C)(3); La.Code Crim. Proc. art. 202(B)(1).

A justice of the peace also has the power to bail or discharge in non-capital cases and those not necessarily punishable by hard labor, i.e., all misdemeanors and relative felonies. Id.; see also La.Code Crim. Proc. art. 333(5). A justice of the peace may issue peace bonds, a summons, or, where imminent and serious harm is threatened, an arrest warrant. Id.; La.Code Crim. Proc. arts. 26 & 28. As in civil matters, see La.Code Civ. Proc. art. 4914, a justice of the peace may punish a person adjudged guilty of direct contempt of court with fines and jail time. La.Code Crim. Proc. art. 25(D). Finally, a justice of the peace may issue search warrants, though only where specifically authorized by law. La. Code Crim. Proc. art. 161; State v. A Minor Child, 493 So.2d 618, 619 (La.1986).
[4] These advisory opinions were also sent by facsimile to respondent on September 22, 1997. Opinion No. 95, dated November 19, 1991, stated that it is ethically impermissible for a justice of the peace also to hold the position of intake warrant officer in the district attorney's office, "as such dual service raises the appearance of impropriety and of a lack of impartiality." Opinion No. 120, dated August 10, 1994, concluded that it is ethically impermissible for a justice of the peace to be employed in the district attorney's office, even as a clerical employee.

The rules creating and governing the Supreme Court Committee on Judicial Ethics are found within the Code of Judicial Conduct. The Committee's function is limited to the issuance of advisory opinions on its own motion or in response to inquiries from a judge. The Committee is comprised of eleven members: the Chief Justice and one other member of the supreme court; the Chairperson of the Conference of Court of Appeal Judges and one other appellate court judge; the President of the District Court Judges Association and two other district judges; one juvenile or family court judge; the Judicial Administrator; and the President of the Louisiana State Bar Association.
The Committee's opinions are not binding on this court, either as dispositive or as precedent. Notwithstanding, a favorable opinion from the Committee is helpful to the inquiring judge and will serve to support his or her good faith.
[5] The letter further advised respondent:

"As was communicated to you previously, there is precedent from the Supreme Court Committee on Judicial Ethics for the proposition that it is impermissible for a justice of the peace to be employed, even as a clerical employee, in the sheriff's office, because such dual service raises the appearance of impropriety and the lack of impartiality in the performance of his or her judicial duties.
The Commission has not authorized the filing of formal charges in this file, but the issue will be placed on the agenda of the October meeting if you have not communicated to me that you have terminated all of your employment relationships with the sheriff's office or resigned as justice of the peace."
[6] The articles of incorporation for ASC were filed and recorded on October 29, 1997, just three days before ASC's contract with the sheriff's office commenced.
[7] The articles of incorporation for GSM were filed and recorded on November 4, 1997, three days after respondent began performing the sheriff's accounting work under the contract between ACS and the sheriff.
[8] Mr. Kissee acknowledged his profit was only $134.00 per month and explained that he had hoped to secure other consulting work with the sheriff's office based on a particular type of computer software used by the sheriff's office. Mr. Kissee was unsuccessful in doing so.
[9] Justice of the Peace McInnis explained that he might have told Mr. Lane or the Sheriff, at sometime or another, that "ethically, I have a problem with being an employee of the sheriff's department." Respondent stated that he did not discuss the ongoing proceedings with those individuals on Special Counsel's advice, presumably to maintain confidentiality.
[10] Justice of the Peace McInnis testified that he asked Special Counsel Scheckman how much time he could have, but he did not state whether Mr. Scheckman answered that question. Instead, respondent speculates as to what amount of time would not have been acceptable. Notably, the rules in the Code of Judicial Conduct governing the Supreme Court Committee on Judicial Ethics provide that the Committee "shall act upon all inquiries as promptly as the nature of the case requires."
[11] Respondent did not indicate Ms. Whitney's response. He acknowledged that canceled checks showing payments from ASC to GSM were provided by ACS only in response to a subpoena duces tecum, which was issued by the Commission on March 4, 1999.
[12] The respondent argues that the fact of his prior "employment relationship" with the sheriff's office is neither relevant nor material to any charge with respect to a subsequent "contractual relationship" with the sheriff's office, because the Commission had closed its file regarding respondent's impermissible employment relationship upon his resignation from that position with the sheriff's office. We agree with the Commission's conclusion that references in the current proceedings to the prior employment relationship and the Commission's closed file are proper under Supreme Court Rule XXIII, § 3(d), which provides:

Closed files of prior proceedings against a judge may be referred to by the Commission at any stage of the current proceedings.
As we stated in In re Quirk, the existence of a previous charge and the discipline imposed are relevant to the Commission when determining the proper discipline to be recommended and to this court when determining the proper discipline to be imposed for subsequent ethical violations. In re Quirk, 97-1143, p. 23, 705 So.2d at 188-89. Moreover, we cited with approval the reasoning that closed disciplinary files can be used "(1) to show that the problem is a continuing one and not just a rare occurrence if a new complaint is based on [a] similar occurrence, and (2) to determine the recommended sanction, whether the subsequent complaint is related or unrelated." Id., 97-1143, pp. 23-24, 705 So.2d at 189 (citing In re Soileau, 502 So.2d 1083, 1086 (La.1987)).
[13] Respondent unpersuasively asserts the sheriff's office never appeared as a party in the justice of the peace court. By statute the justice of the peace does not have jurisdiction in civil cases "when the state, parish, municipality or other political corporation" is a party defendant. La.Rev.Stat. 13:2586(B).