# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #012

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **13th day of March, 2018**, are as follows:

**BY CRICHTON, J.**:

2017-O-2008      IN RE: JUSTICE OF THE PEACE JEFF SACHSE WARD 1, LIVINGSTON PARISH STATE OF LOUISIANA

Upon review of the findings and recommendations of the Judiciary Commission, and considering the record filed herein, we find respondent has violated Canons 1 and 2A of the Code of Judicial Conduct, and hereby suspend respondent without pay for six months. Respondent must also pay to the Commission $3,040.02 in costs.

JOHNSON, C.J., concurs.

## SUPREME COURT OF LOUISIANA

## NO. 2017-O-2008

## IN RE: JUSTICE OF THE PEACE JEFF SACHSE, WARD 1, LIVINGSTON PARISH, STATE OF LOUISIANA

## JUDICIARY COMMISSION OF LOUISIANA

**CRICHTON, J.**

This disciplinary proceeding was instituted by the Judiciary Commission of Louisiana ("Commission") against respondent, Justice of the Peace Jeff Sachse, Ward 1, Livingston Parish, State of Louisiana. The matter arose out of an anonymous complaint lodged against respondent in April 2013, alleging that he was arrested on several occasions for domestic abuse and simple battery of his now ex-wife, Lisa Rabalais. The Commission has alleged that respondent's conduct violated Canons 1 (a judge shall personally observe high standards of conduct so that the integrity and independence of the judiciary may be preserved) and 2A (a judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary) of the Code of Judicial Conduct. For the reasons set forth below, we find respondent has violated the aforementioned Canons as alleged by the Commission, suspend respondent without pay for six months, and order him to reimburse and pay to the Commission $3,040.02 in costs.

### FACTUAL AND PROCEDURAL BACKGROUND

Respondent, who is not a lawyer, was elected to the office of justice of the peace in September 1996. He has served continuously since that time. Respondent and his wife, Lisa Rabalais, were married in 1982 and are the parents of three adult

children.  On August 10, 2012, Ms. Rabalais moved out of the matrimonial domicile in Denham Springs.  While Ms. Rabalais was packing her belongings into the car, the police were summoned to the home in response to complaints by Ms. Rabalais that respondent had grabbed her by the shirt to prevent her from leaving.  On August 17, 2012, Ms. Rabalais filed a Petition for Protection from Domestic Abuse in the 21st Judicial District Court, citing the August 10th incident.  She also alleged that respondent repeatedly contacted her after the incident "by phone[,] email and 3rd parties to get [her] to talk to him" and that he also made "threats" through her places of employment "trying to find [her] to talk." [1]

Based on Ms. Rabalais' petition, Judge M. Douglas Hughes issued a Temporary Restraining Order ("TRO") that directed respondent not to, among other things, "abuse, harass, stalk, follow, or threaten" Ms. Rabalais.  The order also specifically directed respondent not to contact Ms. Rabalais, go within one hundred yards of her residence or her personally, and to stay away from her places of employment.  The TRO was in effect from August 17, 2012 to November 17, 2012.[2] On August 27, 2012, respondent was personally served with a certified copy of the TRO.  Respondent has admitted that he subsequently violated the TRO in the following instances:

(1) By installing a GPS tracking device on the community owned vehicle, a 2012 Chrysler 200, without Ms. Rabalais' knowledge or consent, in order to "aggravate" her;[3]

---

[1] On August 28, 2012, Ms. Rabalais filed a petition for divorce.  The divorce was granted on July 22, 2013.

[2] The Petition for Protection from Abuse was ultimately dismissed for lack of proof.

[3] The evidence indicates that respondent purchased the GPS device on September 25, 2012.  It was discovered by Ms. Rabalais on her vehicle on or about November 28, 2012.

(2) On December 3, 2012, respondent was aware that Ms. Rabalais was working her second job as a personal care attendant for a handicapped person who lived in the Collins Place Subdivision, located in unincorporated Livingston Parish. After Ms. Rabalais left the client's home, respondent pulled into the subdivision in front of Ms. Rabalais' vehicle, got out of his vehicle, and attempted to speak to Ms. Rabalais. Respondent stated that "they needed to talk," and then Ms. Rabalais drove away. Respondent's conduct violated La. R.S. 14:40.2, the statute defining stalking.[4] As a result of a complaint made to the Livingston Parish Sheriff's Office, respondent was arrested for stalking on December 4, 2012.

(3) On February 6, 2013, respondent took the community owned vehicle, a 2012 Chrysler 200, without the knowledge or consent of Ms. Rabalais, for the purpose of harassing her,[5] in violation of the statute defining stalking.

Respondent is also charged with violating the TRO in the following instances, which are not admitted:

(1) The Carroll Baptist Church incident – at the time of the issuance of the TRO, Ms. Rabalais was employed as an instructor and bus driver for the Livingston Activity Center, a facility for handicapped adults. On September 7, 2012, well after respondent was personally served with the TRO, Ms. Rabalais drove some of the

---

[4] La. R.S. 14:40.2 provides in pertinent part as follows:

> Stalking is the intentional and repeated following or harassing of another person that would cause a reasonable person to feel alarmed or to suffer emotional distress. Stalking shall include but not be limited to the intentional and repeated uninvited presence of the perpetrator at another person's home, workplace, school, or any place which would cause a reasonable person to be alarmed, or to suffer emotional distress as a result of verbal, written, or behaviorally implied threats of death, bodily injury, sexual assault, kidnapping, or any other statutory criminal act to himself or any member of his family or any person with whom he is acquainted.

[5] Ms. Rabalais drove the vehicle to work and parked it in the parking lot, as was her normal practice. Unbeknownst to Ms. Rabalais, respondent came to the parking lot and took the vehicle. At the time, respondent was preparing to depart for a trip to Mexico, and he left the vehicle at a friend's house while he was out of the country, with the intent to prevent Ms. Rabalais from using the vehicle during his absence.

Center's clients to the Carroll Baptist Church. While she attempted to unlock the door to the church, Ms. Rabalais saw respondent slowly drive by in his older model Chevrolet pick-up truck. Ms. Rabalais ran inside, locked the church doors, concealed herself, and called the Livingston Parish Sheriff's Office. Ms. Rabalais' co-worker, Karen Watts, testified during the hearing that she was at the church at the time in question, saw respondent's truck, and witnessed Ms. Rabalais' reaction (though she did not actually see respondent). For his part, respondent denied that he was intentionally following or stalking Ms. Rabalais. Instead, respondent testified that he was on the way to his attorney's office when, by coincidence, he saw Ms. Rabalais at the church. Though he described the encounter as pure coincidence, respondent admitted in his sworn statement that he knew that, as a part of her job, Ms. Rabalais escorts her clients to the Carroll Baptist Church.[6]

(2) The Los Sombreros incident – on October 25, 2012, as Ms. Rabalais was leaving the Los Sombreros Mexican Restaurant, located in a strip mall shopping center in Walker, respondent spoke to her and said, "Hey Lisa, funny seeing you here." Ms. Rabalais' friend and co-worker, Velda Thornton, was present and agreed with Ms. Rabalais' version of events. Respondent testified that he saw Ms. Rabalais' car in the parking lot and, after he thought about it, decided to leave the area because of the TRO. He then saw Ms. Rabalais and decided to say something to her. He testified, "I can't swear to exactly what I said, but I'm going to paraphrase and say, hey, I'm leaving. Basically, I was letting her know that if she was – you know, had other things to do here, another little shop to go in or whatever, to tend to it, I'm leaving, you don't have to worry about me." (It should be noted that respondent purchased the GPS tracking device prior to this incident. Nevertheless, he denied that he used the GPS device to track Ms. Rabalais to the restaurant.)

---

[6] However, respondent testified that he did not know the actual day of the week when Ms. Rabalais brought her clients to the church, or the frequency with which she did so.

(3) On February 21, 2013, respondent sat in the Chrysler 200 vehicle along Ms. Rabalais' bus route with a large sign in the front passenger window which read, "Please Call Me." After Ms. Rabalais drove past, respondent pulled up alongside her in an effort to ensure that Ms. Rabalais viewed the sign. On February 26, 2013, only five days later, Ms. Rabalais was traveling on her bus route when respondent once again pulled in front of her while the bus was idling in the turn lane of Highway 190 at Juban Road. In his testimony, respondent denied either incident ever happened. Based on the February 21, 2013 incident, Ms. Rabalais signed an affidavit of probable cause to support the issuance of a warrant for respondent's arrest for stalking. Respondent was arrested on February 27, 2013.

On June 20, 2013, respondent was charged with simple battery of Ms. Rabalais and simple robbery of Ms. Rabalais' friend, Velda Thornton, based on events that occurred on August 10, 2012, when Ms. Thornton assisted Ms. Rabalais in moving out of the matrimonial domicile.[7] Based on these charges, special conditions were added to respondent's bond, ordering that he have "no contact" with Ms. Thornton or Ms. Rabalais. The following incidents occurred after the "no contact" order was added to respondent's bond:

(a) On October 9, 2013, respondent blew his horn and was near Ms. Rabalais when she was driving a client home near Caraway Road.

(b) On October 17, 2013, Ms. Rabalais was once again driving her bus when she noticed respondent traveling in the same direction.

---

[7] Respondent grabbed Ms. Rabalais by the shirt to prevent her from leaving the home, and he took Ms. Thornton's cell phone from her and threw it into a neighbor's yard. The charge of simple battery upon Ms. Rabalais was later amended to domestic abuse battery. On July 28, 2014, respondent was tried before Judge M. Douglas Hughes. At the conclusion of the State's case, the court granted a motion for acquittal on the simple robbery charge but denied the motion as to the domestic abuse battery charge. Following the trial, the court found respondent not guilty of domestic abuse battery.

(c) On November 18, 2013, Ms. Velda Thornton was driving Ms. Rabalais' bus route when she had to slam her brakes to avoid a collision with a brown Chevrolet. She identified the driver as respondent.

(d) On January 25, 2014, Ms. Rabalais observed respondent staring at her while she was putting a package in her vehicle at Nawlin's Sports.

(e) On February 7, 2014, respondent approached Ms. Rabalais in a Wal-Mart in Central, Louisiana and said, "I promise I didn't know you were here and I am leaving now."

(f) On February 20, 2014, respondent followed Ms. Rabalais for approximately two miles while she was driving her regular bus route.

For all of these incidents, Ms. Rabalais made a report to the proper police department.

## DISCIPLINARY PROCEEDINGS

As mentioned previously, an anonymous complaint was lodged against respondent in April, 2013, and a news report of recent felony arrests was posted on the website of THE LIVINGSTON PARISH NEWS on July 7, 2013, listing respondent as a person charged with simple robbery.

After providing the requisite notices of investigation to respondent, the Commission authorized and issued a Notice of Hearing, containing three counts, on September 27, 2016. The Commission alleged that respondent's conduct violated Canons 1 (a judge shall personally observe high standards of conduct so that the integrity and independence of the judiciary may be preserved) and 2A (a judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary) of the Code of Judicial Conduct. The Commission further alleged that respondent engaged in persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute, in violation of La. Const. art. V, § 25(C).

6

Judge Terri Love was appointed as a hearing officer to conduct proceedings in this matter pursuant to Supreme Court Rule XXIII, § 29. The Hearing Officer convened a hearing on March 21-22, 2017. At the beginning of the second day of the hearing, respondent entered into the record three written admissions regarding Counts One and Two of the Notice of Hearing, in which he admitted some, but not all, of the allegations in those counts. (These admissions relate to respondent's violations of the TRO, as set forth above.)

Following the hearing, the Hearing Officer filed findings of fact and conclusions of law with the Commission. Thereafter, the Commission established a briefing schedule, as required by Supreme Court Rule XXIII, § 29, and ordered respondent to appear on August 18, 2017, for questioning by the Commissioners. On December 1, 2017, the Commission filed its recommendation in this court, finding that the allegations of misconduct were proven by clear and convincing evidence and recommending that respondent be suspended without pay for six months. The matter was then set on this Court's docket for oral argument pursuant to Supreme Court Rule XXIII, § 14.

**FINDINGS AND RECOMMENDATION OF THE COMMISSION**

The Commission generally adopted the factual findings made by the Hearing Officer, as well as the Hearing Officer's proposed conclusions of fact and law. Briefly, these conclusions may be summarized as follows:

There is clear and convincing evidence that respondent violated the TRO with respect to the incident at Carroll Baptist Church, the placement of a GPS tracking device on the vehicle in Ms. Rabalais' possession, and the incident at the Los Sombreros Mexican Restaurant. By his own testimony, as well as the numerous exhibits in the record, respondent was distraught and "desperate" after Ms. Rabalais left him. The Hearing Officer found the testimony of Ms. Thornton and Ms. Rabalais to be credible. The fact that respondent placed a GPS tracking device on Ms.

Rabalais' vehicle discounts any claims that his encounter at the restaurant was merely coincidental. This finding is further supported by the number of e-mails and communications from respondent to Ms. Rabalais prior to the incidents in question.

By failing to comply with the TRO, respondent failed to personally observe a high standard of conduct so as to preserve the integrity and independence of the judiciary, in violation of Canon 1 of the Code of Judicial Conduct, and failed to respect and comply with the law and to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary, in violation of Canon 2A.[8] Respondent also engaged in persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute, in violation of La. Const. art. V, § 25(C).

There is clear and convincing evidence that respondent stalked Ms. Rabalais as defined by La. R.S. 14:40.2. With respect to the Collins Place Subdivision and February 6, 2013 Chrysler 200 incidents, respondent has admitted that his actions constituted stalking as defined by the statute. With respect to the incidents on February 21 and 26, 2013, the Hearing Officer found the testimony of Ms. Rabalais to be credible and that the evidence was proven by a clear and convincing standard. Ms. Rabalais' testimony was specific and corroborates the facts found in the police report and arrest warrant.

By violating La. R.S. 14:40.2, respondent failed to personally observe a high standard of conduct so as to preserve the integrity and independence of the judiciary, in violation of Canon 1, and failed to respect and comply with the law and to act in

---

[8] This Court agrees with the Hearing Officer and the Commission that respondent violated Canon 2A, despite the fact that he was never prosecuted or convicted of violating the TRO. This Court also notes, as did the Hearing Officer and the Commission, that the plain language of the Code of Judicial Conduct does not require the prosecution or conviction of a crime in order to find judicial misconduct. Specifically, Canon 2A imposes an affirmative duty upon judicial officers to "respect and comply with the law," which respondent failed to do. At a minimum, respondent's conduct violates Canon 1, since his harassing behavior fails to uphold "high standards of conduct" and "fails to promote public confidence in the integrity … of the judiciary."

a manner that promotes public confidence in the integrity and impartiality of the judiciary, in violation of Canon 2A.[9]  Respondent also engaged in persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute, in violation of La. Const. art. V, § 25(C).

According to La. R.S. 14:79(A)(3), the violation of a protective order includes the "willful disobedience of … (a) An order issued by any state … judge … that a criminal defendant stay away from a specific person or persons as a condition of that defendant's release on bond."

With regard to the incidents that occurred after the "no contact" order was added to respondent's bond, the Hearing Officer acknowledged that although it is entirely possible that one of these encounters may have been a coincidence, the clear and convincing evidence shows that respondent had a pattern of following and approaching his former wife on a frequent basis after the June 27, 2013 "no contact" order was signed.  Accordingly, the Hearing Officer found that respondent violated La. R.S. 14:79(A)(3)(a).

By violating the special conditions of his bond, respondent failed to personally observe a high standard of conduct so as to preserve the integrity and independence of the judiciary, in violation of Canon 1, and failed to respect and comply with the law and to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary, in violation of Canon 2A.[10]  Respondent also engaged in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of La. Const. art. V, § 25(C).

Notwithstanding his many denials regarding his conduct, the Hearing Officer noted that respondent appeared to be remorseful about his actions toward Ms.

_____

[9] As mentioned, no prosecution or conviction for the crime of stalking is required for the reasons discussed in note 8, *supra*.

[10] Again, no prosecution or conviction for the crime of stalking is required for the reasons discussed in note 8, *supra*.

Rabalais and embarrassed by his behavior. Although not in any way an excuse for his actions, respondent's conduct appeared to stem from his difficulty in moving on from his marriage and his desire to spark a reconciliation process. On the other hand, some of respondent's actions were calculated to "aggravate" and, more troubling, harass Ms. Rabalais. Furthermore, respondent's repeated claims that his encounters with Ms. Rabalais were just a coincidence do not extend to every encounter in this case, as shown by the placement of the GPS device on Ms. Rabalais' vehicle. Finally, respondent's pattern of harassment of Ms. Rabalais during the course of over a year and a half shows a pattern of conduct that clearly and unequivocally rises above the threshold of actionable judicial misconduct despite the lack of any judicial findings of criminal liability.

The Hearing Officer also noted that petitioner made admissions that significantly shortened the hearing, thereby decreasing the expenses associated with the hearing. The admissions show that respondent has taken responsibility for some of his most egregious conduct, despite also denying the seriousness of some of his behavior.

At his appearance before the Commission, respondent continued to acknowledge that some of his actions were improper and expressed remorse for this behavior:

> When one goes through a divorce or something of that nature, I think they are subject to do things they otherwise normally would not do. At the time, you know, I didn't look at it from the same perspective that I'm looking at it now. ... I do regret those things with the tracking device, so forth. I mean, I have to take blame for doing that. ... It was a voluntary act. But I knew in my mind I wasn't, I wasn't looking at it like I was violating anything. Looking back now, I see that. ...
>
> Anyway, I'd just ask for mercy and maybe if you could just understand to some degree that I was desperately trying to reconcile our differences in our marriage. Looking back, obviously, it didn't work and wasn't the proper way to do it, that I am sorry for my actions.

Respondent also testified that at some point he gained closure regarding the dissolution of his marriage and that he has not communicated with or had any encounters with his ex-wife for several years, except for a memorial service for his son in May of this year, during which they were cordial with one another. This comports with Ms. Rabalais' testimony at the hearing before the Hearing Officer that she and respondent no longer communicate.

The Office of Special Counsel urged the Commission to recommend to the court that respondent be removed from office. Respondent opposed removal and requested that the Commission recommend a public censure. Although the Commission regarded respondent's misconduct as very serious, the Commission did not consider it to be the type of conduct for which a recommendation of removal is warranted.

In recommending discipline, the Commission looked to the factors set forth by this court in *In re: Chaisson*, 549 So. 2d 259 (La. 1989), and concluded:

(a) and (b) Respondent's actions in stalking and harassing his ex-wife, coupled with his failure to abide by court-ordered protective orders, constitute serious misconduct. Respondent's acts of harassment, stalking, and violations of the law relative to protective orders occurred repeatedly over a substantial period of time, from September 2012 through February 2014, approximately eighteen months. Although respondent's actions within this timeframe plainly evidenced a pattern of very troubling conduct, the Commission did not find that such conduct was part of a larger pattern that extended to other times during respondent's life or judicial career. Rather, the Commission found that respondent's conduct was directly attributable to the emotional distress caused by the break-up of his marriage of thirty-plus years, his difficulty in accepting the dissolution of the marriage, and his desire for reconciliation. It appears that once he accepted the end of his marriage, his

pattern of harassment and stalking of his ex-wife ended, with the last reported incident being in February of 2014, over three and a half years ago.

(c) and (d) Respondent's misconduct occurred outside of the courtroom and in his private life.

(e) and (f) Although coming at a somewhat late stage in the proceedings, respondent filed into the record significant written admissions on the second day of the hearing. As noted by the Hearing Officer, "the admissions show that JP Sachse has taken responsibility for some of his most egregious conduct." In his brief to the Commission, respondent also agreed with the Hearing Officer's conclusions of law regarding some of the violations of the Code of Judicial Conduct and Louisiana Constitution. Although respondent did not admit to all of the factual allegations or all the violations of the Code of Judicial Conduct and Louisiana Constitution as alleged in the Notice of Hearing, the Commission recognizes that respondent has a right to defend himself against the allegations against him.

Respondent appeared remorseful about his actions, apologized for them, and testified that he should have acted differently. Nonetheless, respondent did not appear to fully understand the seriousness of his misconduct, especially his violations of criminal law and court-ordered protective orders. Respondent appeared to overly rely on his distressed emotional state as an explanation (but not a justification) for his actions. Although the Commissioners recognized that divorce and marital issues can cause an individual to engage in conduct that he or she might not otherwise engage in, it did not appear that respondent fully appreciated that as a judicial officer, he is held to a higher standard than an average individual and that his violations of the law and court orders are especially damaging to the respect for, the integrity of, and the public's confidence in this state's judiciary.

(g) Respondent has served as justice of the peace since 1996. At the time of his unethical conduct, respondent was not a new justice of the peace and should have

12

been more familiar with his ethical obligations pursuant to the Code of Judicial Conduct and the Louisiana Constitution, as they relate to his out-of-court conduct.

(h) Respondent has no reportable history of prior judicial misconduct.

(i) Respondent's actions have negatively impacted the integrity of and respect for the judiciary. Respondent, a long-serving judicial officer, admitted that he violated the criminal prohibitions against stalking and violation of protective orders. It is especially damaging to the judiciary when a member of the judiciary ignores the law and duly issued court orders. The public is expected to fully comply with the law or suffer serious consequences. Members of the judiciary are no exception; rather, they are held to a higher standard and expected to set the example. A failure to duly comply with the law and court orders by a member of the judiciary simply cannot be countenanced.

The Commission pointed to this Court's language in *In re: Ellender*, 04-2123, pp. 8-9 (La. 12/13/04), 889 So. 2d 225, 231: "It is widely understood that judges symbolize the law, and, accordingly, their actions reflect favorably or unfavorably on the judicial system. As a public official, a judge's behavior both on and off the bench must comply with the highest of standards delineated in the Canons." Accordingly, "[a] criminal act for which any citizen may be punished by imprisonment is much more serious when the conduct is that of a judge," and such conduct "is clearly prejudicial to the administration of justice and brings the judicial office into disrepute." *In re: Whitaker*, 463 So. 2d 1291, 1303 (La. 1985) (suspending judge for one year without pay for, among other things, smoking marijuana on two occasions after becoming a judge and associating with prostitutes and users and sellers of illegal drugs); *see also In re: Soileau*, 502 So. 2d 1083 (suspending a judge for six months without pay for, among other things, committing a battery on a law enforcement official and disturbing the peace at a crawfish festival).

(j) Although respondent, in his personal desire to reunite with his former wife, seriously violated the Code of Judicial Conduct and the Louisiana Constitution, the evidence does not indicate that he exploited his position in doing so.

Based on these considerations, some of which the Commission regarded as aggravating and some as mitigating, the Commission recommended that respondent be suspended without pay for six months. The Commission also recommended that respondent be ordered to reimburse and pay to the Commission $3,040.02 in costs. In his brief to this Court, respondent accepted the recommendations of the Commission, and agreed to abide by any sanctions imposed by this Court.

## DISCUSSION

Article V, § 25(C) of the 1974 Louisiana Constitution provides the substantive grounds for disciplinary action against a judge. The Code of Judicial Conduct adopted by this court under its supervisory authority supplements the constitution's substantive grounds for disciplinary action against a judge. *In re Justice of the Peace Franklin*, 07-1425, p. 14 (La. 11/27/07), 969 So.2d, 591, 600. The Code is binding on all judges, including justices of the peace. *In re Justice of the Peace Myrty Alfonso,* 07-0120, p. 7 (La. 5/22/07), 957 So.2d 121, 122, citing *In re: Wilkes*, 403 So.2d 35, 40 (La.1981). "Violations of the Canons contained in the Code of Judicial Conduct can serve as a basis for the disciplinary action provided for by Article V, § 25(C) of the Constitution." *Id.,* citing *In re: McInnis*, 00-1026, p. 1 (La.10/17/00), 769 So.2d 1186, 1188 n. 2. This Court has stated:

> The Code of Judicial Conduct was enacted by this court pursuant to its constitutionally-granted supervisory authority over all lower courts. This constitutional grant of supervisory authority is plenary, unfettered by jurisdictional requirements, and exercisable at the complete discretion of the court. La. Const. art. V, § 5(A); *Unwired Telecom v. Parish of Calcasieu*, 03–0732, p. 8 (La.1/19/05), 903 So.2d 392, 400 (*on reh'g*). As explained above, the Code requires all judges, including justices of the peace, to comply with its requirements. Additionally, in La. R.S. 42:1167, the legislature has recognized that all judges, as defined by the Code of Judicial Conduct, shall be governed exclusively

14

by that Code. This statute, which became effective April 1, 1980, acknowledges this court's authority to provide the exclusive means by which judges' conduct is governed. *See In re: Ellender*, 04–2123, p. 6 (La.12/13/04), 889 So.2d 225, 230 ("The legislative statement in La. R.S. 42:1167 codifies our jurisprudence which provides that judges are governed exclusively by the Code, and the Code is not contrary to the Constitution's exclusive grant of authority to this Court in the realm of judicial misconduct.").

*In re Justice of the Peace Larry Charles Freeman*, 08-1820, p. 13-14 (La. 12/2/08), 995 So.2d 1197, 1206 (internal cites omitted).

Furthermore, "a justice of the peace is governed by the same constitutions and laws that govern all courts and judges of this state, and is bound to apply the law as written by the legislature and construed by the various courts." *Alfonso*, *supra*, citing *Wilkes*, 403 So.2d at 44. The charge against a judge must be proven by clear and convincing evidence before this court can impose discipline. *In re Hunter*, 02-1975, p. 4 (La. 8/19/02), 823 So.2d 325, 328.

Justice of the Peace Sachse was charged with violations of Canons 1 and 2A of the Code of Judicial Conduct. Canon 1, "A Judge Shall Uphold the Integrity and Independence of the Judiciary," provides:

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and shall personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code are to be construed and applied to further that objective. As a necessary corollary, the judge must be protected in the exercise of judicial independence.

Canon 2A, under the title "A Judge Shall Avoid Impropriety and the Appearance of Impropriety in All Activities, provides that "[a] judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

Based upon our review of the record before us, we find there is clear and convincing evidence that respondent has violated the Code of Judicial Conduct as alleged herein. Respondent engaged in a repeated pattern of stalking and harassing his ex-wife, resulting in numerous violation(s) of court protective orders, including

a 2013 "no contact" order. Although respondent was never convicted, he was arrested for these transgressions, and prosecution or conviction is not required to find judicial misconduct.[11] As the Commission duly noted, it is troublesome and particularly damaging to the judiciary when a member of the judiciary ignores the law and duly issued court orders. Furthermore, notwithstanding the emotional turmoil of a divorce, his cumulative behavior over approximately 18 months is inexcusable and unbecoming of the judiciary. While we acknowledge respondent expressed remorse for his actions and he has had no further contact with his ex-wife since 2014, this Court must hold him accountable for his actions, which fell below the standard set forth in the Code of Judicial Conduct.

## CONCLUSION

Upon review of the findings and recommendations of the Judiciary Commission, and considering the record filed herein, we find respondent has violated Canons 1 and 2A of the Code of Judicial Conduct, and hereby suspend respondent without pay for six months. Respondent must also pay to the Commission $3,040.02 in costs.

---

[11] As discussed in n. 8, *supra*, the plain language of the Louisiana Code of Judicial Conduct does not require an actual conviction to find a violation of the same. *See also In re Kuehnel*, 49 N.Y.2d 465 (1980); *In re Young*, 522 N.E.2d 386 (Ind. 1988); and *In re Fowler*, 593 So.2d 1043 (Fla. 1992).

**SUPREME COURT OF LOUISIANA**

**No. 2017-O-2008**

**IN RE: JUSTICE OF THE PEACE JEFF SACHSE, WARD 1, LIVINGSTON PARISH, STATE OF LOUISIANA**

**JUDICIARY COMMISSION OF LOUISIANA**

**JOHNSON, C.J.,** concurs.